889 A.2d 387

**CLENDENIN BROTHERS, INC., et al.**

v.

**UNITED STATES FIRE INSURANCE COMPANY.**

**Misc. No. 2, Sept. Term 2005.**

Court of Appeals of Maryland.

Jan. 6, 2006.

Katherine J. Henry (Dickstein Shapiro Morin & Oshinsky, L.L.P., Washington, DC; Philip B. Barnes of Whiteford, Taylor & Preston, L.L.P., Towson; Richard W. Fields, Elizabeth A. Sherwin and Andrew N. Bourne of Dickstein Shapiro Morin & Oshinsky, New York City, of counsel), all on brief, for Appellants.

Matthew J. Fader, Kirkpatrick & Lockhart Nicholson Graham, L.L.P., Pittsburgh, PA; Kenneth M. Argentieri, Christopher C. French, Paul K. Stockman, of counsel, brief of Amicus Curiae, the ESAB Group, Inc.

Katherine J. Henry, Dickstein Shapiro Morin & Oshinsky, L.L.P., Washington, DC; Richard W. Fields, Elizabeth A. Sherwin and Andrew N. Bourne of Dickstein Shapiro Morin & Oshinsky, New York City, of counsel, brief of the Gases and Welding Distributors Ass'n as Amicus Curiae in Support of Petitioners.

Robert R. Lawrence (Richard Hammer of Hunton & Williams, L.L.P., McLean, VA; John Charles Thomas, Benjamin L. Hatch of Hunton & Williams, L.L.P., Richmond, VA), all on brief, for Appellee.

Laura A. Foggin, John C. Yang, W. Clifton Holmes, Wiley Rein & Fielding, L.L.P., Washington, DC, brief of Amicus Curiae Complex Ins. Claims Litigation Ass'n in support of Respondent.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

HARRELL, Judge.

Pursuant to the Maryland Uniform Certification of Questions of Law Act, Maryland Code (1974, 2002 Repl.Vol., 2005 Cum.Supp.), Courts and Judicial Proceedings Article, §§ 12–601 though 12–613, and Maryland Rule 8–305, the United States District Court for the District of Maryland (Garbis, J.) certified the following question for our consideration:

Whether an insurance company has a duty to defend and/or indemnify its insured in underlying actions alleging injury from exposure to localized welding fumes

    a) Where the insurance policy contains a total pollution exclusion that denies coverage for " 'bodily injury' or 'property damage' which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release, or escape of pollutants at any time,"

    b) Where pollutants are defined as "any solid, liquid, gaseous, or thermal irritant or contaminant including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste," and

    c) Where waste is defined as "materials to be recycled, reconditioned or reclaimed."

We respond in the affirmative to the certified question.

## I.

The District Court supplied the following factual background in its Certification Order:

The instant case is a suit for declaratory relief pursuant to 28 U.S.C. § 2201 brought by United States Fire Insurance Company ("U.S. Fire" or "Insurer") against Clendenin Brothers, Inc., et. al. ("Clendenin" or "Insureds"). U.S. Fire issued the Insureds a primary general liability policy as well as an umbrella policy for the period of July 1, 1995 to July 1, 1996 to provide coverage for claims brought against the Insureds alleging injuries sustained by use of the Insureds' welding products. Insureds presently seek insurance coverage under these policies for both the defense and indemnification of certain lawsuits that have been brought against them which allege bodily injury related to fumes caused by welding activity. [The District Court elaborated in a footnote: "The plaintiffs in the underlying suits are individuals who allege that proper use of the Insureds' welding products produced harmful localized fumes containing manganese which caused bodily harm and

neurological damage."] U.S. Fire presently seeks a declaration from this Court that it has no duty to defend or indemnify the Insureds in these welding related suits as the conditions and exclusions of the policies (specifically the total pollution exclusions) exclude such claims. Additionally, U.S. Fire seeks a determination that it has no duty to defend or indemnify the Insureds with respect to similar lawsuits filed in the future against the Insureds.

The relevant provisions of the pollution exclusion in question, which U.S. Fire asserts relieves it of its duty to defend and duty to indemnify the Insureds against the welding related claims made against the Insureds, state as follows: [1]

TOTAL POLLUTION EXCLUSION

\* \* \*

This Insurance does not apply to:

f. (1) "Bodily Injury" or "property damage" which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants at any time.

\* \* \*

Pollutants means any solid, liquid, gaseous, or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acid, alkalis, chemicals and waste. Waste includes material to be recycled, reconditioned or reclaimed.

Each party filed a Motion for Summary Judgment in the District Court. Insurer argued that the language of the exclusions in the insurance policy is unambiguous, as a matter of law, and bars explicitly coverage of the claims against the Insureds. Insureds asserted that the total pollution exclusion is ambiguous with regard to manganese welding fumes and thus does not bar coverage. Concurrently with its Motion for Summary Judgment, Insureds also filed the present Motion

---

1. The relevant language of the total pollution exclusions contained in the commercial general liability policy and the umbrella policy are indistinguishable for our purposes. The language above is found in the commercial general liability policy.

for Certification requesting the District Court to ask this Court to address, under Maryland law, the scope of the total pollution exclusion with regard to manganese welding fumes. Consideration of the cross-motions for summary judgment was stayed by the District Court pending a response from this Court regarding the certified question.

## II.

We are presented here with an issue of first impression in Maryland (as well as other states): to determine whether a total pollution exclusion provision in an insurance policy relieves the policy issuer from its duty to defend and/or indemnify the policy's holder where the alleged harm was caused by localized, workplace manganese welding fumes. Maryland appellate courts, however, previously encountered somewhat similar issues.

In *Bernhardt v. Hartford Fire Insurance Company*, 102 Md.App. 45, 57, 648 A.2d 1047, 1052 (1994), the Court of Special Appeals held that "the absolute pollution exclusion clause is clear and unambiguous in th[e] context" of carbon monoxide fumes that escaped from the central heating system of a residential apartment building and, therefore, the insurer, Hartford Fire Insurance Company ("Hartford"), was not obligated to defend or indemnify the insured, the landlord of the building. The underlying claim was initiated by tenants in the building for personal injury and damages caused by carbon monoxide fumes emitted from the central heating system. *Bernhardt*, 102 Md.App. at 47, 648 A.2d at 1047. The insurer argued that it had no duty to defend or indemnify the insured as the exclusion applied "to bodily injury or property damage arising out of the actual, alleged or threatened discharge, dispersal, release or escape of pollutants: a) at or from premises owned, rented or occupied by the named insured" where pollutants were defined as "any solid liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, and waste." *Bernhardt*, 102 Md.App. at 48–49, 648 A.2d at 1048. Affirming the trial court's grant of Hartford's motion for summary judgment in

the declaratory relief action concerning the insurer's duties under the insurance policy, the Court of Special Appeals determined that the pollution exclusion clause was dispositive and thus the insurer had no duty to defend or indemnify. *Bernhardt,* 102 Md.App. at 48, 57, 648 A.2d at 1048, 1052.[2]

The intermediate appellate court rejected the landlord's primary argument. Conceding that carbon monoxide is a pollutant within the plain language of the pollution exclusion clause, the insured argued that "notwithstanding the literal language of the exclusion, the parties intended that it apply only to persistent industrial pollution of the environment, and not to an accident of the kind generally covered by a comprehensive business liability policy." *Bernhardt,* 102 Md.App. at 50, 648 A.2d at 1049. After reviewing the historical development of the exclusion clause in the insurance industry, the intermediate appellate court focused on the landlord's assertion that the pollution exclusion was ambiguous when applied to the specific facts of the case. *Bernhardt,* 102 Md.App. at 53–54, 648 A.2d at 1050. As a result of the landlord's concession that carbon monoxide was included within the contractual definition of pollution, the court stated that "[t]he carbon monoxide gas in this case was a 'gaseous ... irritant or contaminant' and constituted 'fumes' and 'chemicals' within the clear language of the definition of 'pollutant.'" *Bernhardt,* 102 Md.App. at 55, 648 A.2d at 1051. While the court noted that the "pollution exclusion" title of the provision by itself is ambiguous and would not provide an insured with an understanding of the "breadth" of the exclusion, it also noted that "[t]he language of the contract between the parties is, however, quite specific." *Id.* Thus, the court stated it was "unable to say a person of ordinary intelligence reading the language of this absolute pollution exclusion would conclude that it did not apply to the facts of this case." *Id.*

---

2. Although this Court granted the insured's petition for a writ of certiorari in *Bernhardt,* 337 Md. 641, 655 A.2d 400 (1995), the case was dismissed before oral argument after the petitioner/insured filed a dismissal of appeal. 338 Md. 415, 659 A.2d 296 (1995).

One year after *Bernhardt*, this Court decided *Sullins v. Allstate Insurance Company*, 340 Md. 503, 667 A.2d 617 (1995). *Sullins* also was a certified question case submitted by the United States District Court for the District of Maryland. *Sullins*, 340 Md. at 506, 667 A.2d at 618. We were asked there to decide whether Allstate Insurance Company ("Allstate"), the insurer, had a duty to defend and/or indemnify Reverend D. Paul Sullins and Patricia H. Sullins, the insureds/landlords, in an action brought by their tenants alleging injury from lead paint exposure in the rented premises. *Sullins*, 340 Md. at 506–07, 667 A.2d at 618–19. Allstate argued that the insurance policy excluded coverage through the express language of the contract: "We do not cover bodily injury or property damage which results in any manner from the discharge, dispersal, release, or escape of: a) vapors, fumes, acids, toxic chemicals, toxic liquids or toxic gasses; b) waste materials or other irritants, contaminants or pollutants." *Sullins*, 340 Md. at 506–07, 667 A.2d at 618. We concluded that an ambiguity existed regarding whether lead paint was encompassed by the language of the policy exclusion. *Sullins*, 340 Md. at 509, 667 A.2d at 620. Applying the rules of insurance contract interpretation employed in Maryland state courts, we stated that where there is no extrinsic evidence to clarify the parties' intentions regarding terms, following a finding of ambiguity, "the policy must be construed against Allstate as the drafter of the policy." *Sullins*, 340 Md. at 509–10, 667 A.2d at 620. We concluded that "the pollution exclusion clause does not remove Allstate's duty to defend the Sullinses in the underlying lead paint poisoning action," and the pollution exclusion alone would not "insulate the insurer from indemnifying its insured." *Sullins*, 340 Md. at 518, 667 A.2d at 624.

In finding ambiguity in the language of the pollution exclusion, we stated that "[t]he terms in the exclusion, 'contaminants' and 'pollutants,' are susceptible of two interpretations by a reasonably prudent layperson. By one interpretation, these terms encompass lead paint; by another interpretation, they apply only to cases of environmental pollution or contami-

nation, and not to products such as lead paint." *Sullins,* 340 Md. at 509, 667 A.2d at 620. To support the determination of the existence of ambiguity with these terms as used in the exclusion clause of the insurance policy, the Court first analyzed dictionary definitions of the terms and concluded that a reasonable prudent layperson may consider lead paint to be a "contaminant" or "pollutant." *Sullins,* 340 Md. at 510, 667 A.2d at 620. We also concluded, however, that a reasonably prudent layperson may interpret the terms as not including lead paint. *Sullins,* 340 Md. at 511, 667 A.2d at 620. After noting conflicting interpretations by courts of our sister states of the term "pollutant" in the context of lead paint exposure, the Court also catalogued numerous foreign courts that found various other products not to be "pollutants" or "contaminants." *Sullins,* 340 Md. at 511–13, 667 A.2d at 620–21. After a historical review of the evolution of pollution exclusions, the Court concluded ultimately that "the insurance industry intended the pollution exclusion to apply only to environmental pollution." *Sullins,* 340 Md. at 515–16, 667 A.2d at 623. Citing *St. Leger v. American Fire and Casualty Insurance Company,* 870 F.Supp. 641 (E.D.Pa.1994), and *Atlantic Mutual Insurance Company v. McFadden,* 413 Mass. 90, 595 N.E.2d 762 (1992), the Court recognized that "the conflict in judicial opinions regarding whether lead paint is a 'pollutant' under the pollution exclusion remains." *Sullins,* 340 Md. at 516, 667 A.2d at 623. On this point, however, we held "that conflicting interpretations of policy language in judicial opinions is not determinative of, but is a factor to be considered in determining the existence of ambiguity." *Sullins,* 340 Md. at 518, 667 A.2d at 624.

## III.

"The promise to defend the insured, as well as the promise to indemnify, is the consideration received by the insured for payment of the policy premiums." *Brohawn v. Transamerica Insurance Company,* 276 Md. 396, 409, 347 A.2d 842, 851 (1975). In *Aetna Casualty & Surety Company v. Cochran,* 337 Md. 98, 102, 651 A.2d 859, 861 (1995) (citing

*Brohawn, supra*), we stated that "an insurance company has a duty to defend its insured for all claims which are potentially covered under an insurance policy." *See also Litz v. State Farm Fire & Casualty Company*, 346 Md. 217, 231, 695 A.2d 566, 572 (1997) ("If there is a possibility, even a remote one, that the plaintiff's claims could be covered by the policy, there is a duty to defend."). To determine in a given instance whether an insurer has a duty to defend, we engage in a two-part inquiry, as articulated in *St. Paul Fire & Marine Insurance Company v. Pryseski*, 292 Md. 187, 193, 438 A.2d 282, 285 (1981):

> In determining whether a liability insurer has a duty to provide its insured with a defense in a tort suit, two types of questions ordinarily must be answered: (1) what is the coverage and what are the defenses under the terms and requirements of the insurance policy? (2) do the allegations in the tort action potentially bring the tort claim within the policy's coverage? The first question focuses upon the language and requirements of the policy, and the second question focuses upon the allegations of the tort suit.

Thus, in the present case, we shall determine first the intended scope and limitations of coverage under the primary general liability and umbrella policies at the time of execution. Next, we shall determine whether the allegations—that proper use of the Insureds' welding products in the regular course of business produced harmful localized fumes containing manganese causing bodily harm and neurological damage—potentially would be covered under the insurance policies as written.

When interpreting the meaning of an insurance policy under the first prong of our analytical paradigm, we construe the instrument as a whole to determine the intention of the parties. *Cheney v. Bell National Life Insurance Company*, 315 Md. 761, 767, 556 A.2d 1135, 1138 (1989); *Pacific Indemnity Company v. Interstate Fire & Casualty Company*, 302 Md. 383, 388, 488 A.2d 486, 488 (1985) (citations omitted). We have stated that "[a]n insurance policy is a contract between the parties, the benefits and obligations of which are defined by the terms of the policy." *Kendall v. Nationwide*

*Insurance Company,* 348 Md. 157, 165, 702 A.2d 767, 770 (1997). Thus, "[w]e look first to the contract language employed by the parties to determine the scope and limitations of the insurance coverage." *Cole v. State Farm Mutual Insurance Company,* 359 Md. 298, 305, 753 A.2d 533, 537 (2000) (citing *Chantel Associates v. Mount Vernon Fire Insurance Company,* 338 Md. 131, 142, 656 A.2d 779, 784 (1995), and *Kendall,* 348 Md. at 165, 702 A.2d at 771). When interpreting the language of a contract, "we accord a word its usual, ordinary and accepted meaning unless there is evidence that the parties intended to employ it in a special or technical sense." *Cheney,* 315 Md. at 766, 556 A.2d at 1138 (citing *Pacific Indemnity Company,* 302 Md. at 389, 488 A.2d at 488, and *Mutual Life Insurance Company v. Murray,* 111 Md. 600, 605, 75 A. 348 (1909)). Additionally, Maryland state courts "examine the character of the contract, its purpose, and the facts and circumstances of the parties at the time of execution." *Pacific Indemnity Company,* 302 Md. at 388, 488 A.2d at 488 (citations omitted).

■■ If an analysis of the language shows that the terms used in the insurance policy are plain and unambiguous, "we will determine the meaning of the terms of the contract as a matter of law," *Cole,* 359 Md. at 305, 753 A.2d at 537; however, "if the language is ambiguous, extrinsic evidence may be consulted." *Collier v. MD–Individual Practice Association, Inc.,* 327 Md. 1, 6, 607 A.2d 537, 539 (1992). As we have stated on numerous occasions in the context of contract interpretation, "[a] term of a contract is ambiguous if, to a reasonably prudent person, the term is susceptible to more than one meaning." *Cole,* 359 at 305–06, 753 A.2d at 537 (citing *Pacific Indemnity Company,* 302 Md. at 389, 488 A.2d at 489; *Pryseski,* 292 Md. at 198, 438 A.2d at 288; *Truck Insurance Exchange v. Marks Rentals, Inc.,* 288 Md. 428, 433, 418 A.2d 1187, 1190 (1980)). Maryland does not follow, as a matter of first resort, the view of construing an insurance policy most strongly against the insurer, *Cheney,* 315 Md. at 766, 556 A.2d at 1138; however, if ambiguity is determined to remain after consideration of extrinsic evidence, "it will ordi-

narily be resolved against the party who drafted the contract," where no material evidentiary factual dispute exists. *Collier,* 327 Md. at 6, 607 A.2d at 539; *see also Brownstein v. New York Life Insurance Company,* 158 Md. 51, 59, 148 A. 273, 276 (1930) ("[I]t is a rule common to the construction of all written instruments that it is to be taken, in cases of doubtful meaning, against the draftsman."); *Truck Insurance Exchange,* 288 Md. at 435, 418 A.2d at 1191 ("[I]t is a sound principle of contract construction that where one party is responsible for the drafting of an instrument, absent evidence indicating the intention of the parties, any ambiguity will be resolved against that party."). Moreover, we have stated that "any doubt as to whether there is a potentiality of coverage under an insurance policy is to be resolved in favor of the insured." *Chantel Associates,* 338 Md. at 145, 656 A.2d at 786 (citing *U.S. Fidelity & Guaranty Company v. National Paving & Contracting Company,* 228 Md. 40, 55, 178 A.2d 872, 879 (1962)).

## IV.

The issue of whether a total pollution exclusion clause bars coverage for injuries caused by various substances has been litigated heavily in state and federal courts in modern times. *See Meridian Mutual Insurance Company v. Kellman,* 197 F.3d 1178, 1181 (6th Cir.1999) ("State and federal courts are split on the issue of whether an insurance policy's total pollution exclusion bars coverage for all injuries caused by contaminants, or whether the exclusion applies only to injuries caused by traditional environmental pollution."); *Center for Creative Studies v. Aetna Life & Casualty Company,* 871 F.Supp. 941, 943 (E.D.Mich.1994) (quoting Jeffrey W. Stempel, *Interpretation of Insurance Contracts: Law and Strategy for Insurers and Policyholders* 825 (1994): "[o]ne of the most hotly litigated insurance coverage questions of the late 1980s and early 1990s has been the scope and application of the pollution exclusion contained in the standard commercial general liability (CGL) policy") (alteration in original). Yet, the specific issue of determining the applicability of a total pollu-

tion exclusion in the context of manganese welding fumes has not been addressed by Maryland or other states' high courts.

Guided by our principles of insurance contract interpretation, we conclude that the language of the pollution exclusion in the present case is ambiguous in the context of manganese welding fumes. A reasonably prudent person could construe the pollution exclusion clause in the present case as both including and not including manganese welding fumes. In *National Electrical Manufacturers Association (NEMA) v. Gulf Underwriters Insurance Company*, 162 F.3d 821 (4th Cir.1998), the United States Court of Appeals for the Fourth Circuit addressed the scope of a pollution exclusion in the specific context of manganese welding fumes. In *NEMA*, the only state or federal case to date addressing this particular issue, the Fourth Circuit, applying the law of the District of Columbia, concluded that it "need look no further than the exclusion's plain language to conclude that it explicitly applies to the underlying actions." *NEMA*, 162 F.3d at 825. Specifically, the court concluded that because "[t]he exclusion defines 'pollutant' to include any 'solid, gaseous or thermal irritant or contaminant,' including 'fumes,'" the insurer had no duty to defend against "welder claims aris[ing] from the release of a gaseous pollutant, specifically, 'fumes, particulates and gases containing manganese.'" *NEMA*, 162 F.3d at 824–25. Thus, just as the Fourth Circuit determined, a reasonably prudent person could conclude that the contractually defined term "pollutant" encompasses manganese welding fumes.

■ It seems to us, however, that an equally reasonable and prudent person could conclude, considering the character and purpose of the insurance policy and the facts and circumstances surrounding its execution, that manganese welding fumes are not included within the usual, ordinary, and accepted meaning of "pollutant." Pollutant is defined under the policy as "any solid, liquid, gaseous, or thermal irritant or contaminant." This construction indicates that the physical matter, whether solid, liquid, gaseous, or thermal, also must be considered an irritant or contaminant. Moreover, the

illustrative terms that follow (i.e., "including smoke, vapor, soot, fumes, acid, alkalis, chemicals and waste") logically also must qualify as irritants or contaminants. Interpreting this provision otherwise would render it virtually limitless, which we conclude could not have been the intention of either party. Therefore, reading this definitional provision as a whole, we conclude that to qualify as a pollutant under the contractual definition the substance must be understood to be an irritant or contaminant.

As resorted to in *Sullins*, Webster's Dictionary defines "irritant" as "something that irritates or excites" and "irritated" as "roughened, reddened, or inflamed." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1197 (1993) [hereinafter "WEBSTER'S"]. Webster's Dictionary defines "contaminant" as "something that contaminates" and "contaminate" as "to soil, stain, corrupt, or infect by contact or association" or "make inferior or impure by mixture." WEBSTER'S, *supra*, at 491.

A reasonably prudent person might not consider manganese generally to be an irritant or contaminant. In *Bernhardt*, the insured conceded that carbon monoxide was a pollutant as defined in the policy. *Bernhardt*, 102 Md.App. at 50, 648 A.2d at 1049. Notwithstanding that concession, a reasonably prudent person would not consider carbon monoxide anything but a harmful substance. *See, e.g.*, McGRAW-HILL DICTIONARY OF CHEMISTRY 105 (1984) (defining "carbon monoxide" as "[a] colorless, odorless gas . . . poisonous to animals"). In contrast, manganese, in certain concentrations and forms, has positive applications and long has been used in the normal course of business by welders. As the U.S. Court of Appeals for the Seventh Circuit noted, "[m]anganese is a naturally occurring element and is an essential ingredient to the proper manufacture of steel because it prevents steel from cracking and falling apart when it is manufactured." *Jones v. Lincoln Electric Company*, 188 F.3d 709, 715 (7th Cir.1999). The manganese used by welders is incorporated in the form of a welding rod. *Id.* The heat used in the welding process causes welding fumes when the metal to be bound and rod fuse together. *Id.* Consequently, "[a] small amount of the fumes

generated by the burning of a mild steel welding rod consists of manganese." *Id.*

As noted in an article provided in the record extract in the present case, "[n]o one denies that manganese, although essential to human health in small amounts, is poisonous in large quantities." Jean Hellwege, *Welding Rod Litigations Heats Up; Workers Claim Toxic Fumes Cause Illness*, 40 TRIAL MAGAZINE 7, 14 (2004), *available at* 2004 WL 68663752. Yet, in *Sullins*, this Court concluded ultimately that "a reasonably prudent layperson may interpret the terms 'pollution' and 'contamination' . . . as *not* encompassing lead paint, *a product used legally and intentionally.*" *Sullins*, 340 Md. at 516, 667 A.2d at 623 (first emphasis in original) (second emphasis added). In so doing, we stated that "[s]ome courts have held that products, *despite their toxic nature*, are *not* 'pollutants' or 'contaminants' *when used intentionally and legally.*" *Sullins*, 340 Md. at 512, 667 A.2d at 621 (emphasis added). Specifically, we noted that the North Carolina Court of Appeals held that "styrene resin used to resurface a floor was not a pollutant, but 'a raw material used . . . in [the] normal business activity of resurfacing floors.'" *Sullins*, 340 Md. at 512, 667 A.2d at 621 (quoting *West American Insurance Company v. Tufco Flooring East, Inc.*, 104 N.C.App. 312, 409 S.E.2d 692 (1991), *overruled on other grounds by, Gaston County Dyeing Machine Company v. Northfield Insurance Company*, 351 N.C. 293, 524 S.E.2d 558 (2000) (alteration in original)). In *Sullins*, we highlighted also a federal district court decision that held that "88% formic acid used to determine whether a carpet was suitable for dyeing was not a pollutant." *Sullins*, 340 Md. at 512, 667 A.2d at 621 (citing *Regent Insurance Company v. Holmes*, 835 F.Supp. 579, 582 (D.Kan.1993)).

The form taken of the manganese used here, as used in the ordinary course of the particular business involved, would not be considered by a reasonably prudent person to be excluded through a pollution exclusion provision. Insurer argues that the manganese welding fumes fall literally within the contractual definition of pollutant as it includes "any" gaseous materi-

al and the underlying plaintiffs allege the fumes "irritated" or "contaminated." As a federal district court stated, "[a]ny substance could conceivably be an 'irritant or contaminant' under the right circumstances." *Westchester Fire Insurance Company v. City of Pittsburg, Kansas,* 794 F.Supp. 353, 355 (D.Kan.1992), *aff'd on other grounds, Pennsylvania National Mutual Casualty Insurance Company v. City of Pittsburg, Kansas,* 987 F.2d 1516 (10th Cir.1993). In *Sullins,* we considered and rejected this potentially limitless view:

> The terms "irritant" and "contaminant," when viewed in isolation, are virtually boundless, for "there is virtually no substance or chemical in existence that would not irritate or damage some person or property." Without some limiting principle, the pollution exclusion clause would extend far beyond its intended scope, and lead to some absurd results. Take but two simple examples, reading the clause broadly would bar coverage for bodily injuries suffered by one who slips and falls on the spilled contents of a bottle of Drano, and for bodily injury caused by an allergic reaction to chlorine in a public pool. Although Drano and chlorine are both irritants and contaminants that cause, under certain conditions, bodily injury or property damage, one would not ordinarily characterize these events as pollution.

*Sullins,* 340 Md. at 512–513, 667 A.2d at 621 (quoting *Pipefitters Welfare Educational Fund v. Westchester Fire Insurance Company,* 976 F.2d 1037, 1043 (7th Cir.1992) (citation omitted)). Accordingly, in our judgment, a reasonably prudent person could consider manganese welding fumes not to be a pollutant under the usual, ordinary, and accepted meaning of the word "pollutant."

The development and refinement over time of the pollution exclusion provision used in insurance policies supports our conclusion that the pollution exclusion at issue was not drafted to exclude localized manganese welding fumes encountered during the normal course of business operations. In *Sullins,* we reviewed the historical development of pollution exclusions

inserted in insurance policies.[3]  As a direct result of the historical examination, we stated that "the insurance industry intended the pollution exclusion to apply only to environmental pollution." *Sullins,* 340 Md. at 515–16, 667 A.2d at 623. Although the pollution exclusion considered in *Sullins* is not identical to the pollution exclusion in the present case, the altered language in the present case does not demonstrate an appreciable difference, in our view, in the underlying purposes of the pollution exclusion clauses in the two cases.

Determinations by other courts reviewing the historical purpose of the pollution exclusion, where the exclusion clause at issue was equivalent or similar to the language in the present case, supports this conclusion.  For instance, the U.S. Court of Appeals for the Sixth Circuit noted: "[m]any courts, including the Sixth Circuit, have held that a pollution exclusion clause in a CGL insurance policy applies only to injuries caused by traditional environmental pollution." *Kellman,* 197 F.3d at 1181 (citing over twenty state and federal cases to support its view); *see also Stoney Run Company v. Prudential–LMI Commercial Insurance Company,* 47 F.3d 34, 37 (2nd Cir.1995) (stating that "we believe that it is appropriate to construe the standard pollution exclusion clause in light of its general purpose, which is to exclude coverage for environmental pollution").  Additionally, in reviewing a total pollution exclusion, which included language virtually identical to the relevant portion of the present total pollution exclusion, the Supreme Court of Wyoming recently stated:

> The pollution exclusion had its inception in the 1970's in response to federal and state legislation mandating responsibility for the cleanup costs of environmental pollution.  9

---

**3.**  During this Court's examination of the purpose of these exclusions, we highlighted, on several occasions, the historical analysis undertaken by the Court of Special Appeals in *Bernhardt.  See Sullins,* 340 Md. at 513–15, 667 A.2d at 622–23; *see also American States Insurance Company v. Koloms,* 177 Ill.2d 473, 227 Ill.Dec. 149, 687 N.E.2d 72, 79 (1997) ("The events leading up to the insurance industry's adoption of the pollution exclusion are well documented and relatively uncontroverted.") (internal quotations omitted) (citation omitted).

*Couch on Insurance* 3d § 127:3 (1997). The purpose of the current version of the exclusion remains to exclude these governmentally mandated cleanup costs. *Koloms,* 227 Ill. Dec. 149, 687 N.E.2d at 81–82. To read the exclusion more broadly ignores the insurers' objective in creating the exclusion and ignores the general coverage provisions of the policy. *Kent Farms, Inc. v. Zurich Ins. Co.,* 140 Wash.2d 396, 998 P.2d 292, 295 (2000).

*Gainsco Insurance Company v. Amoco Production Company,* 53 P.3d 1051, 1066 (Wyo.2002). Ultimately the Wyoming court concluded: "[w]e cannot believe that any person in the position of the insured would understand the word 'pollution' in this exclusion to mean anything other than environmental pollution." *Id.* The Supreme Court of Illinois, after a lengthy review of the historical development of pollution exclusion clauses, also stated: "[o]ur review of the history of the pollution exclusion amply demonstrates that the predominate motivation in drafting an exclusion for pollution-related injuries was the avoidance of the enormous expense and exposure resulting from the explosion of *environmental* litigation." *American States Insurance Company v. Koloms,* 177 Ill.2d 473, 227 Ill.Dec. 149, 687 N.E.2d 72, 81 (1997) (internal quotations omitted) (emphasis in original). Therefore, given our assessment in *Sullins* of the historical development of the pollution exclusion clause, in conjunction with the conclusions reached by foreign courts reviewing similar policy language as is presently before us, we conclude that the policy exclusion does not apply beyond traditional environmental pollution situations.

Finally, both the general purpose of general commercial liability insurance coverage and the specific language of this particular pollution exclusion clause demonstrate that potentially noxious workplace fumes, like the type present here, were not intended to be excluded. Under an insurance policy, the insured pays a prescribed premium, the amount of which is set by the risk to the insurer, to obtain different limits of insurance coverage prescribed in the policy. General commercial liability insurance coverage is obtained by the insured to

protect itself against routine commercial hazards. *See also Tufco,* 409 S.E.2d at 697 ("If this Court accepted [the insurer's] interpretation of the CGL policy, we would be allowing an insurance company to accept premiums for a commercial liability policy and then to hide behind ambiguities in the policy and deny coverage for good faith claims that arise during the course of the insured's normal business activity."). Welding fumes emitted during the normal course of business appear to be the type of harm intended to be included under coverage for routine commercial hazards.

The specific language used in the total pollution exclusion clause, when read in its entirety, supports the conclusion that noxious workplace fumes were not intended to be excluded. Describing the methods of exposure to the pollutants, the policy states that the insurance does not apply to bodily harm caused by "the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape" of pollutants. In *Sullins,* we stated that the terms "discharge," "dispersal," "release," "escape," "contaminant," and "pollutant" "are terms of art in environmental law and are used by Maryland courts to refer to environmental exposure." *Sullins,* 340 Md. at 515, 667 A.2d at 622–23 (citations omitted). The U.S. Court of Appeals for the First Circuit has stated similarly that "the terms used in the exclusion clause, such as 'discharge,' 'dispersal,' 'release' and 'escape,' are terms of art in environmental law and are generally used to refer to damage or injury resulting from environmental pollution." *Nautilus Insurance Company v. Jabar,* 188 F.3d 27, 30 (1st Cir.1999). Accordingly, considering the policy as a whole, as well as the facts and circumstances surrounding its execution, we conclude that the language of the present total pollution exclusion is ambiguous in the context of manganese welding fumes.[4]

---

4. Similar to our observations regarding lead paint in *Sullins,* to ensure that localized, non-environmental workplace manganese welding fumes were excluded through the total pollution exclusion, the drafter of the insurance contract could have included explicitly a provision doing so. *Sullins,* 340 Md. at 518 n. 3, 667 A.2d at 624 n. 3 (citing *Chantel,* 338

We conclude also that the current construction of the total pollution exclusion clause drafted by Insurer was not intended to bar coverage where Insureds' alleged liability may be caused by non-environmental, localized workplace fumes. In *Meridian Mutual Insurance Company v. Kellman, supra,* 197 F.3d at 1180, the U.S. Court of Appeals for the Sixth Circuit concluded, following Michigan law, that the total pollution exclusion in that case, which was identical to the one used in the present case, did not bar the insurer's duties to defend and indemnify the insured in a noxious fumes context. The underlying suit involved a teacher who alleged that the fumes given off by the insured's use of a sealant on a floor in the room immediately above her classroom caused the teacher respiratory injuries. *Id.* The court concluded that "the total pollution exclusion clause at bar does not shield the insurer from liability for injuries caused by toxic substances that are still confined within the general area of their intended use." *Kellman,* 197 F.3d at 1184.

We expect that, our decision notwithstanding, interpretation of the scope of pollution exclusion clauses likely will continue to be ardently litigated throughout state and federal courts. We are aware also that courts may arrive at divergent decisions from our own within the specific context of manganese welding fumes. *See, e.g., NEMA,* 162 F.3d at 826. Yet, guided by Maryland's rules for interpreting insurance contracts, we conclude that the total pollution exclusion clause does not relieve U.S. Fire of its duties to defend and indemnify the Insureds in the underlying tort action allegedly caused by localized, non-environmental workplace manganese welding fumes. Because the allegations that proper use of the Insureds' welding products produced harmful localized fumes containing manganese caused bodily harm and neurological damage *potentially* could be covered under the insurance policies, the Insurer has a duty to defend and/or indemnify the Insureds.

---

Md. at 137 n. 5, 656 A.2d at 779 n. 5, and *J.A.M. v. Western World,* 95 Md.App. 695, 698, 622 A.2d 818, 819 (1993)).

CERTIFIED QUESTION OF LAW ANSWERED AS SET FORTH ABOVE; COSTS TO BE EQUALLY DIVIDED BY THE PARTIES.