# FOR PUBLICATION

ATTORNEYS FOR APPELLANTS:

**JEFFREY B. FECHT**
**BRYCE H. BENNETT**
Riley Bennett & Egloff, LLP
Indianapolis, Indiana

**JEFFREY C. GERISH**
Plunkett Cooney
Bloomfield Hills, Michigan

**EDWARD F. HARNEY, JR.**
**WILLIAM D. BEYERS**
Hume Smith Geddes Green & Simmons, LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**JEFFREY D. CLAFLIN**
Plews Shadley Racher & Braun, LLP
South Bend, Indiana

**THERESA M. WILLARD**
Plews Shadley Racher & Braun, LLP
Indianapolis, Indiana



FILED
Jan 23 2014, 10:30 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

CHUBB CUSTOM INSURANCE COMPANY, ET AL., )
)
)
Appellants-Defendants, )
)
vs. )   No. 49A02-1301-PL-91
)
STANDARD FUSEE CORPORATION, )
)
Appellee-Plaintiff. )

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable S. K. Reid, Judge
Cause No. 49D14-0512-PL-48895

**January 23, 2014**

**OPINION - FOR PUBLICATION**

**RILEY, Judge**

## STATEMENT OF THE CASE

Appellants-Defendants, GAN North American Insurance Company (GAN) and Chubb Custom Insurance Company (Chubb) (collectively, Appellants), appeal the trial court's summary judgment and award of defense costs in favor of Appellee-Plaintiff, Standard Fusee Corporation (Standard Fusee).[1]

We reverse.

## ISSUE

Appellants raise three issues on appeal, one of which we find dispositive and which we restate as: Whether, under Maryland law, the trial court erred in deciding that the total pollution exclusion clause in Appellants' comprehensive general liability insurance policies is not applicable to Standard Fusee's liability for the release of perchlorate and therefore Appellants' duty to defend and indemnify was triggered.

## FACTS AND PROCEDURAL HISTORY

Standard Fusee, headquartered in Maryland, manufactures highway and marine signal/safety flares. An essential ingredient in the manufacture of these flares is perchlorate. In 1988, Standard Fusee purchased the marine signal assets of Olin Corporation (Olin), while at the same time, it also leased two manufacturing facilities from Olin: one at Peru, Indiana and one at Morgan Hill, California. Standard Fusee manufactured highway flares at the Morgan Hill site until 1995. In 1997, Standard Fusee purchased the Peru site from Olin, where it continued its manufacture of marine flares.

_____

[1] We held oral argument in this case on November 12, 2013 in the Court of Appeals Courtroom in Indianapolis, Indiana. We thank counsel for their excellent advocacy.

2

In 2002, Olin informed Standard Fusee that perchlorate had been discovered in water samples at and around the Morgan Hill site. In September of 2002, Standard Fusee and Olin were notified by the City of Morgan Hill that the City would seek to recover its damages and costs resulting from the perchlorate contamination. In February of 2003, the first of 259 private lawsuits was initiated against Standard Fusee and Olin by property owners in the vicinity of the Morgan Hill facility. The lawsuits generally alleged that Standard Fusee and Olin were responsible for the perchlorate contamination, which resulted in property damage, emotional distress, negligence, nuisance, and trespass. The complainants requested injunctive relief, actual and punitive damages, and attorney's fees. All of these individual actions were eventually dismissed as to Standard Fusee, either voluntarily or on summary judgment.

Because the Morgan Hill and Peru plants had similar histories, Standard Fusee decided to initiate a voluntary screening inspection of the Peru site in 2004 to determine the presence of perchlorate contamination. Upon discovery of a possible contamination at the Peru facility, Standard Fusee contacted the Indiana Department of Environmental Management (IDEM). After requesting admission, Standard Fusee was accepted in the State's Voluntary Remediation Program in December 2005. Pursuant to the guidelines of the Program, Standard Fusee negotiated the terms of a Voluntary Remediation Agreement with IDEM, hired an environmental consultant, and conducted the necessary investigation of the site. This inspection confirmed the presence of perchlorate contamination on the Peru site and on an adjacent farm. In accordance with the Agreement, Standard Fusee submitted a work plan to accomplish the remediation of the

Peru plant site and adjoining areas, including the farm. This work plan was approved on June 24, 2010. Failure to comply with the requirements of the Agreement would expose Standard Fusee to enforcement actions and/or civil penalties.

Standard Fusee notified its comprehensive general liability insurance carriers, including Chubb and Gan, concerning the claims at Morgan Hill and Peru and requested defense and indemnification. Relying on the pollution exclusion provision in their respective insurance policies, Chubb and Gan rejected their duty to defend Standard Fusee against these claims and refused indemnification. The Chubb comprehensive general liability insurance policy contains the following pollution exclusion endorsement:

A. This insurance does not apply to bodily injury, property damage, advertising injury, or personal injury arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release, or escape of pollutants:

1. at or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured;

* * *

4. at or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations;

B. This insurance does not apply to any loss, cost or expense arising out of any

1. request, demand, or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of pollutants; or

2. claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, or neutralizing or in any way responding to, or assessing the effects of pollutants.

4

\* \* \*

DEFINITIONS WHEN USED WITH RESPECT TO INSURANCE UNDER THIS CONTRACT:

Pollutants means any solid, liquid, gaseous or thermal irritant or containment, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

(Appellants' App. pp. 01045-01046, 01152-01356). While Gan's comprehensive general liability insurance contains the substantially similar pollution exclusion language for bodily injury and property damage (Coverage A), with respect to personal and advertising injury (Coverage B), the policy did not include a pollution exclusion endorsement. Specifically, regarding Coverage B, Gan's policy provided as follows:

COVERAGE B. PERSONAL AND ADVERTISING INJURY LIABILITY

1. Insuring Agreement
a. We will pay those sums that the insured becomes legally obligated to pay as damages because of personal injury or advertising injury to which this coverage part applies. We will have the right and duty to defend any suit seeking those damages. We may at our discretion investigate any occurrence or offense and settle any claim or suit that may result. But:

\* \* \*

b. This insurance applies to:
(1) "Personal Injury" caused by an offense arising out of your business, excluding advertising, publishing, broadcasting or telecasting done by or for you;

(2) "Advertising injury" caused by an offense committed in the course of advertising your goods, products or services; but only if the offense was committed in the coverage territory during the policy period.

5

SECTION V – DEFINITIONS

1. "Advertising Injury" means injury arising out of one or more of the following offenses:

a. oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

b. oral or written publication of material that violates a person's right of privacy;

c. Misappropriation of advertising ideas or style of doing business; or

d. Infringement of copyright, title or slogan.

\* \* \*

13. "Personal Injury" means injury, other than "bodily injury," arising out of one or more of the following offenses:

a. False arrest, detention, or imprisonment;

b. Malicious prosecution;

c. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling, or premises that a person occupies by or on behalf of its owner, landlord or lessor;

d. Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services; or

e. Oral or written publication of material that violates a person's right of privacy.

(Appellants' App. pp. 1376, 1381, 1383-84).

On December 19, 2005, Standard Fusee filed a complaint for declaratory relief and damages against, among others, Chubb and Gan, seeking coverage under the comprehensive general liability policy for claims of perchlorate contamination asserted

against it in California and Indiana. On October 10, 2006, Standard Fusee filed a motion for partial summary judgment, requesting a declaration that Gan and Chubb owed it a duty to defend and indemnify as a matter of law. Applying Indiana law to the issue, Standard Fusee contended that no potential coverage defense precluded a declaration of a duty to defend. Chubb and Gan filed a cross-motion for summary judgment asserting the application of Maryland law to the underlying claims. On July 9, 2008, the trial court entered summary judgment for Standard Fusee and against Chubb and Gan. Applying Indiana law, the trial court held that the pollution exclusion clauses included in the insurance policies were unenforceable. The trial court granted Chubb and Gan's request to certify its judgment for interlocutory appeal and this court accepted jurisdiction.

On December 9, 2009, after a detailed choice-of-law analysis, we reversed the trial court's conclusion and adopted a site-specific approach, holding that while Indiana law governs the dispute insofar as it arises out of the site at Peru, Indiana, California law governs the dispute insofar as it arises out of the site in California. *See Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Standard Fusee Corp*., 917 N.E.2d 170 (Ind. Ct. App. 2009), *reh'g denied, trans. granted*. The Indiana Supreme Court granted transfer on petitions for transfer filed by both parties. On December 29, 2010, our supreme court applied the uniform-contract-interpretation approach and concluded that based on the contacts with Maryland, including the fact that Standard Fusee is and has always been headquartered in Maryland, this case should be decided pursuant to Maryland law. *See Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Standard Fusee Corp*, 940 N.E.2d 810 (Ind. 2010), *reh'g*

*denied*. Thus, the supreme court reversed the trial court and remanded this case for application of Maryland law to the entire dispute.

On February 23, 2012, upon remand, the trial court entered summary judgment in favor of Standard Fusee finding that the pollution exclusion endorsements in Appellants' insurance policies are not enforceable with respect to the underlying claim under Maryland law. As such, the trial court declared that Gan and Chubb had incurred a duty to defend and indemnify. Although Appellants moved to certify the trial court's judgment for interlocutory appeal, the trial court refused to grant certification.

Seven months after the trial court entered its summary judgment, Standard Fusee filed its defense cost and fee petition. Through two orders entered respectively on December 24, 2012 and December 31, 2012, the trial court entered judgment in favor of Standard Fusee and against Chubb in the amount of $1,767,242.12 and against Gan in the amount of $1,178,161.42.

Appellants now appeal. Additional facts will be provided as necessary.

DISCUSSION AND DECISION

Appellants contend that the trial court erred when it entered summary judgment in favor of Standard Fusee, holding that, under Maryland law, the total pollution exclusion clause in Appellants' comprehensive general liability insurance policies is not applicable to Standard Fusee's liability for the release of perchlorate and thereby triggering Appellants' duty to defend and indemnify.

A. *Standard of Review*

8

Summary judgment is appropriate only when there are no genuine issues of material fact and the moving party is entitled to a judgment as a matter of law. Ind. Trial Rule 56(C). A fact is material if its resolution would affect the outcome of the case, and an issue is genuine if a trier of fact is required to resolve the parties' differing accounts of the truth . . ., or if the undisputed facts support conflicting reasonable inferences. *Williams v. Tharp*, 914 N.E.2d 756, 761 (Ind. 2009). In reviewing a trial court's ruling on summary judgment, this court stands in the shoes of the trial court, applying the same standards in deciding whether to affirm or reverse summary judgment. *First Farmers Bank & Trust Co. v. Whorley*, 891 N.E.2d 604, 607 (Ind. Ct. App. 2008), *trans. denied*. Thus, on appeal, we must determine whether there is a genuine issue of material fact and whether the trial court has correctly applied the law. *Id*. at 607-08. In doing so, we consider all of the designated evidence in the light most favorable to the non-moving party. *Id*. at 608. The party appealing the grant of summary judgment has the burden of persuading this court that the trial court's ruling was improper. *Id*. When the defendant is the moving party, the defendant must show that the undisputed facts negate at least one element of the plaintiff's cause of action or that the defendant has a factually unchallenged affirmative defense that bars the plaintiffs' claim. *Id*. Accordingly, the grant of summary judgment must be reversed if the record discloses an incorrect application of the law to the facts. *Id*.

We observe that, in the present case, the trial court entered detailed findings of fact and conclusions of law in support of its judgment. While special findings are not required in summary judgment proceedings and are not binding on appeal, such findings

9

offer this court valuable insight into the trial court's rationale for its decision and facilitate appellate review. *Id*.[2]

B. *Analysis*

Our analysis of Appellants' contention necessarily requires us to interpret the pollution exclusion endorsement included in the comprehensive general liability policies. Under Maryland law, the obligation of an insurer to defend its insured under a contract provision is determined by the allegations in the tort actions. If the plaintiffs in the tort suits allege a claim covered by the policy, the insurer has a duty to defend. *Nautilus Ins. Co. v. BSA Limited Partnership, et al*., 602 F. Supp. 2d 641 (D. Md. 2009). Even if a tort plaintiff does not allege facts which clearly bring the claim within the policy coverage, the insurer still must defend if there is a potentiality that the claim could be covered by the policy. *Sullins v. Allstate Ins. Co*., 667 A.2d 617, 620 (Md. Ct. App. 1995). *See also Sheets v. Brethren Mut. Ins. Co*., 679 A.2d 540, 544 (Md. Ct. App. 1996) (duty to defend exists if plaintiffs in a tort action allege an action that is potentially covered by the policy, no matter how attenuated, frivolous, or illogical that allegation may be). Any doubt as to whether there is a potentiality of coverage under an insurance policy is to be resolved in favor of the insured. *Chantel Assocs. v. Mount Vernon Fire Ins. Co*., 656 A.2d 779, 786 (Md. Ct. App. 1995).

---

[2] It should be noted that the trial court's findings of fact and conclusions in its summary judgment was adopted *verbatim* from Standard Fusee's proposed order. We have previously recognized that "[a]lthough it is not prohibited to adopt a party's proposed order *verbatim*, this practice weakens our confidence as an appellate court that the findings are the result of the considered judgment by the trial court." *Safety Nat. Cas. Co. v. Cinergy Corp*., 829 N.E.2d 986, 993 n.6 (Ind. Ct. App. 2005). However, because our review is *de novo*, this cautionary language carries less weight.

Maryland courts have established a two-part inquiry for determining whether an insurer has a duty to defend its insured. First, the court must determine "the coverage and . . . the defenses under the terms and requirements of the insurance policy." *St. Paul Fire & Marine Ins. Co. v. Pryseski*, 438 A.2d 282, 285 (Md. Ct. App. 1981). This inquiry "focuses upon the language and requirements of the policy." *Id*. Second, focusing upon the allegations of the underlying suit, the court must determine whether the "allegations in the tort action potentially bring the tort claim within the policy's coverage." *Id*.

When determining the scope and limitations of coverage under an insurance policy, Maryland courts "construe the instrument as a whole to determine the intention of the parties" and "examine the character of the contract, its purpose, and the facts and circumstances of the parties at the time of execution." *Clendenin Bros., Inc. v. United States Fire Ins. Co.*, 889 A.2d 387, 393 (Md. Ct. App. 2006). When interpreting the language of a contract, the court shall "accord a word its usual, ordinary and accepted meaning unless there is evidence that the parties intended to employ it in a special or technical sense." *Id*. If the terms used are unambiguous, the meaning of the terms are determined by the court as a matter of law. *Id*. If the terms of the policy are ambiguous, the court may consult extrinsic evidence. *Id*. A contract term is ambiguous "if, to a reasonably prudent person, the term is susceptible to more than one meaning." *Id*. While Maryland does not apply the principle found in other jurisdictions that an insurance policy is to be construed most strongly against an insurer, an ambiguous term will ordinarily be resolved against the party who drafted the contract. *Id*. at 394.

The appellate briefs of the parties focus on the same pivotal issue: whether the release of perchlorate by Standard Fusee can be categorized as traditional environmental pollution. According to Chubb and Gan, the question is very simple: if the release of perchlorate is defined as traditional environmental pollution, Maryland law enforces the application of the pollution exclusion clause in the insurance contract and coverage is precluded.

### 1. *History of the Contractual Pollution Exclusion Clause*

Maryland courts have held that the historical development of environmental pollution litigation provided the basis for its disambiguation of pollution exclusion clauses. That development played a decisive role in the Maryland courts' conclusion to limit the application of the pollution exclusion clauses to cases of traditional environmental pollution. *Travelers Indem. Co. v. MTS Transport, LLC*, 2012 WL 3929810 (W.D. Penn. Sept. 7, 2012) (not reported in F. Supp. 2d (2012)). Prior to 1970, courts broadly interpreted the term "accident" and, later, the term "occurrence" in insurance policies to provide coverage for environmental pollution that was "neither intended nor expected." *Id*. With the passage of the Clean Air Act, there was a drastic increase in environmental claims, and in response, the insurance industry attempted to limit coverage through the inclusion of a pollution exclusion clause in comprehensive general liability policies. *Id*. This pollution exclusion clause included the limitation that the exclusion did not apply where the pollution was "sudden and accidental;" the intent was for the insurance policy to provide coverage only in situations where pollution abruptly, unexpectedly, and unintentionally occurred. *Id*. However, the "sudden and

accidental" language did not achieve the insurers' desired result of creating an exclusion of coverage for any and all gradual environmental pollution.  *Id.*

With the passage of the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), high costs were imposed on companies for pollution cleanup, and companies turned to insurance policies for coverage.  *Id.*  Consequently, the insurance industry resorted to the "absolute pollution exclusion" to reject coverage for the high costs of government cleanup of long-term industrial environmental pollution.  *Id.*  These newly-introduced absolute pollution exclusion clauses were intended to deny "coverage for 'bodily injury or property damage arising out of the actual, alleged or threatened discharge, release or escape of pollutants'" and defined 'pollutant' as 'any solid, liquid, gaseous or thermal irritant or contaminant including smoke, vapor, soot, fumes, acids, alkalies, chemicals and waste.'  *Id.*  Relying on this historical development as the foundation for its opinions, Maryland courts developed its case law analyzing pollution exclusion clauses through two principal decisions.

### 2.  *Sullins v. Allstate Ins. Co., 667 A.2d 617 (Md. Ct. App. 1995)*

Decided in 1995, *Sullins* was the first important case in Maryland to interpret the absolute pollution exclusion.  In *Sullins*, the United States District Court for the District of Maryland certified a question to the Maryland Court of Appeals as to whether an insurer had a duty to defend and/or indemnify its insured in an action alleging injury from exposure to lead paint where the insurance policy contained the pollution exclusion.  *Id.* at 618.  The Sullinses, as insureds and landlords, brought a declaratory action against Allstate to declare Allstate's duty to defend/indemnify for a complaint brought by the

Sullinses' tenants alleging injury from lead paint exposure in the rented premises. *Id*. The *Sullins* court concluded that an ambiguity existed regarding whether lead paint was encompassed by the language of the policy exclusion. *Id*. at 620. In finding ambiguity, the court stated that "[t]he terms in the exclusion, 'contaminants' and 'pollutants' are susceptible of two interpretations by a reasonably prudent lay person." *Id.*

To support the determination of ambiguity in these terms as used in the exclusion clause of the insurance policy, the *Sullins* court first analyzed the dictionary definition of the terms and concluded that a reasonable prudent lay person may consider lead paint to be a 'contaminant' or a 'pollutant.' *Id*. The court also concluded, however, that a reasonably prudent lay person may interpret the terms as not including lead paint at all. *Id*. After noting conflicting interpretations by its sister states of the term 'pollutant' in the context of lead exposure, the court also catalogued numerous foreign courts that found various other products not to be 'pollutants' or 'contaminants.' *Id*. at 620-21. After a historical review of the evolution of the pollution exclusion clause, the *Sullins* court concluded ultimately that "the industry's intention [] to exclude only environmental pollution is evidenced by the use of the words 'discharge, dispersal, release, escape, contaminant, and pollutant' as these terms are terms of art in environmental law and are used by Maryland courts to refer to environmental exposure." *Id*. at 622. As such, the *Sullins* court reasoned that "the insurance industry intended the pollution exclusion to apply only to environmental pollution." *Id*. at 622. As a result, the *Sullins* court held that the pollution exclusion clause did not remove Allstate's duty to defend the Sullinses in

14

the underlying lead paint poisoning action and the pollution exclusion alone would not "insulate the insurer from indemnifying its insured." *Id*. at 624.

      3.  *Clendenin Bros., Inc. v. U.S. Fire Ins. Co., 889 A.2d 387 (Md. Ct. App. 2006)*

      In *Clendenin*, the Maryland Court of Appeals considered the certified question whether an insurance company had a duty to defend and/or indemnify its insured in the underlying actions alleging injury from exposure to localized, workplace manganese welding fumes when the insurance policy contains the standard total pollution exclusion provision. *Id*. at 389. Relying on *Sullins* and the historical evolution of pollution exclusion clauses, the court noted that "[t]he development and refinement over time of the pollution exclusion provision used in insurance policies supports our conclusion that the pollution exclusion was not drafted to exclude localized manganese welding fumes encountered during the normal course of business operations." *Id*. at 397. Rather, the court held that the policy exclusion does not apply beyond traditional environmental pollution situations. *Id*. at 398. Applying this rule to the circumstances of the case, the *Clendenin* court ruled:

> [B]oth the general purpose of general commercial liability insurance coverage and the specific language of this particular pollution exclusion clause demonstrate that potentially noxious workplace fumes, like the type present here, were not intended to be excluded. . . . General commercial liability insurance coverage is obtained by the insured to protect itself against routine commercial hazards. . . . Welding fumes emitted during the normal cause of business appear to be the type of harm intended to be included under coverage for routine commercial hazards.

15

*Id*.[3]  Therefore, as in *Sullins*, the *Clendenin* court did not define traditional environmental pollution but rather applied the standard used by most courts, *i.e.*, the "'We-know-it-when-we-see-it' standard to determine what constitutes traditional environmental pollution." *See Conn. Specialty Ins. Co. v. Loop Paper Recycling, Inc.*, 824 N.E.2d 1125, 1138 (Ill. App. Ct. 2005).

4.  *Application to the Case at Bar.*

Turning to the case before us, we reiterate the language of the pollution exclusion clause at issue:

> A.  This insurance does not apply to bodily injury, property damage, advertising injury, or personal injury arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release, or escape of pollutants:
>
>> 1.  at or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured;
>
> * * *
>
>> 4. at or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations;
>
> B.  This insurance does not apply to any loss, cost or expense arising out of any
>
>> 1. request, demand, or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of pollutants; or

---

[3] In its brief, Standard Fusee distilled the so-called "five *Clendenin* factors" "why a reasonably prudent person could conclude that the pollution exclusion does not apply to manganese fumes." (Appellant's Br. p. 15).  However, it should be noted that this is Standard Fusee's interpretation.  The *Clendenin* court never listed these "factors" as determinative but rather arrived at them by comparing the situation at hand to other case law.  These factors are more properly considered dicta, as the *Clendenin* court's holding is that the policy exclusion does not apply beyond traditional environmental pollution situations.

16

2. claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, or neutralizing or in any way responding to, or assessing the effects of pollutants.

\* \* \*

DEFINITIONS    WHEN USED WITH RESPECT TO INSURANCE UNDER THIS CONTRACT:

Pollutants means any solid, liquid, gaseous or thermal irritant or containment, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, and waste.   Waste includes materials to be recycles, reconditioned or reclaimed.

(Appellants' App. pp. 01045-01046, 01152-01356).

Guided by the principles of Maryland's contract interpretation, we conclude that perchlorate is included within the usual, accepted meaning of "pollutant."   In the underlying complaint, submitted against Standard Fusee in California, perchlorate is described as:

a highly toxic chemical and is widely known to produce adverse health effects, including an increased risk of cancer.  Perchlorate binds weakly to soil particles and is not significantly broken down in the environment.  It is extremely soluble in water and highly mobile, migrating faster and further than many other water contaminants.   These characteristics make perchlorate a particularly persistent and problematic contaminant once it is allowed to enter a groundwater system.

(Appellants' App. p. 261).   "The scientific community has been aware of the hazardous and harmful effects of perchlorate for decades."   (Appellants' App. p. 262).   This research culminated in proposed national regulations issued by the Environmental Protection Agency (EPA).   In 1998, the EPA placed perchlorate on the contaminant candidate list for National Primary Drinking Water Regulation as it was determined that

17

drinking perchlorate laced water may result in Thyroid disorders and Thyroid cancer. Although perchlorate is a naturally occurring substance, it is clear that is also a harmful contaminant once ingested or disseminated into the environment. As such, perchlorate qualifies as a pollutant under the contractual definition of the pollution exclusion clause.

Since 1988, Standard Fusee has manufactured marine flares—in which perchlorate is an essential ingredient—in Peru, Indiana. Even though Standard Fusee was in legal compliance during its manufacturing process, perchlorate was found to contaminate the soil of the Peru site as well as that of adjacent areas. Unlike the localized, workplace-limited effect of the fumes in *Clendenin*, here, a hazardous substance was released into the soil and dispersed to an adjacent farm. Although perchlorate was used during Standard Fusee's business operations, the prolonged release and seepage of contaminants into the environment cannot be categorized as a normal course of business when it results in participation in IDEM's Remediation Program. In other words, the continuous discharge of perchlorate over multiple years went beyond the routine commercial hazard of an occasional spill.

Based on the facts before us, we conclude that Standard Fusee's claim is based on a hazardous pollution contamination, resulting from the cumulative effect of numerous releases which occurred on an ongoing basis during the regular course of business over an extended period of time, up to the point where the pollution became concomitant to Standard Fusee's regular business activity. Accordingly, considering Maryland's case law, the policy as a whole, as well as the facts and circumstances before us, we hold that

the perchlorate contamination amounts to traditional environmental pollution, which falls within the province of the policy's pollution exclusion clause.

## 5. *Gan's Part B – Personal Injury Coverage*

Next, Standard Fusee contends that the environmental injury should be categorized as personal injury and therefore the personal injury coverage—which does not include a pollution exclusion clause in Gan's policy—comes into play. In turn, Gan replies that the personal injury coverage is not implicated by pollution claims under Maryland law.

### 1. *Waiver*

Because Standard Fusee did not invoke coverage under the personal injury provisions of the insurance policy (Coverage B), Gan now initially claims that the argument is waived. Specifically, Standard Fusee only raised the argument after the supreme court remanded to the trial court for application of Maryland law "to the entire dispute." *Nat'l union Fire Ins. Co.*, 940 N.E.2d at 817. However, it should be noted that "[w]hen no instructions are given to a trial court on remand the course of further proceedings is within the discretion of the trial court." *Grant v. Hager*, 879 N.E.2d 628, 631 (Ind. Ct. App. 2008).

### 2. *No Coverage under Personal Injury Clause*

Gan's personal injury clause, included in Coverage B, provides as follows:

COVERAGE B. PERSONAL AND ADVERTISING INJURY LIABILITY

1. Insuring Agreement

19

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of personal injury or advertising injury to which this coverage part applies.  We will have the right and duty to defend any suit seeking those damages. We may at our discretion investigate any occurrence or offense and settle any claim or suit that may result.  But:

* * *

b.  This insurance applies to:
(1) "Personal Injury" caused by an offense arising out of your business, excluding advertising, publishing, broadcasting or telecasting done by or for you;

(2) "Advertising Injury" caused by an offense committed in the course of advertising your goods, products or services; but only if the offense was committed in the coverage territory during the policy period.


SECTION V – DEFINITIONS
1. "Advertising Injury" means injury arising out of one or more of the following offenses:

    a. oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

    b. oral or written publication of material that violates a person's right of privacy;

    c. Misappropriation of advertising ideas or style of doing business; or

    d. Infringement of copyright, title or slogan.

* * *

13.  "Personal Injury" means injury, other than "bodily injury," arising out of one or more of the following offenses:

    a. False arrest, detention, or imprisonment;

    b. Malicious prosecution;

c. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling, or premises that a person occupies by or on behalf of its owner, landlord or lessor;

d. Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services; or

e. Oral or written publication of material that violates a person's right of privacy.

(Appellants' App. pp. 1376, 1381, 1383-84).

Noting that the pollution exclusion in Gan's policy only covers property damage, the trial court concluded that "[t]he personal injury provision of the Gan policy [] provides independent coverage for Standard Fusee's personal injury claims arising from the perchlorate contamination of third-party property at Peru and Morgan Hill." (Gan's Br. p. 57). To reach this conclusion, the trial court determined that "contamination of another's property is an actionable trespass or invasion, and the trespass-type offenses in the personal injury coverage are not limited to landlord-tenant disputes." (Gan's Br. p. 58).

Gan contends, and we agree, that the trial court erred because the language of Coverage B limits the qualifying injury to certain specifically enumerated offenses, none of which falls within the purview of the current situation. As the language of Coverage A and B appear to be mutually exclusive, there is no potential for coverage under Coverage B because Standard Fusee only sought coverage for suits arising out of 'property damage' or 'bodily injury' at the Peru site and only Coverage A institutes coverage for bodily injury or tangible property.

Furthermore, we find that the trial court's reliance on the "wrongful entry into" language in Coverage B is misplaced. Pursuant to Maryland law, this exception has only been applied in landlord-tenant situations, not with respect to environmental pollution. *See Nautilus Ins. Co. v. BSA Ltd. Partnership*, 602 F.Supp. 2d 641 (D. Md. 2009) (although the court applied the phrase in a landlord-tenant situation, the court recognized that the phrase carries a wide range of interpretations by various courts and under the facts before it, found the phrase to be ambiguous). We are not inclined to extend the scope of coverage of the wrongful entry provision to the current situation.

We expect that, our decision notwithstanding, interpretation of the scope of pollution exclusion clauses likely will continue to be ardently litigated throughout state and federal courts. We are also aware that courts may arrive at divergent decisions from our own within the specific context of perchlorate contamination. Yet, guided by Maryland's rules for interpreting insurance contracts, we conclude that the total pollution exclusion clause applies and relieves Appellants of their duty to defend and indemnify the Standard Fusee in the underlying action.

## CONCLUSION

Based on the foregoing, we conclude that the total pollution exclusion clause in Appellants' comprehensive general liability insurance policies is applicable to Standard Fusee's liability for the release of perchlorate and therefore Appellants' duty to defend and indemnify is not triggered.

Reversed.

KIRSCH, J. and ROBB, J. concur

22