## NAUTILUS INSURANCE COMPANY

v.

## BSA LIMITED PARTNERSHIP, et al.

### Civil No. JFM–07–11.

United States District Court,
D. Maryland.

March 10, 2009.

Stacey Ann Moffet, Eccleston and Wolf PC, Hanover, MD, Gerald P. Konkel, Morgan Lewis and Bockius LLP, Washington, DC, for Nautilus Insurance Company.

Tracie N. Wesner, Eccleston and Wolf PC, Washington, DC.

Isabelle Marie Thabault, Washington Lawyers Committee for Civil Rights, Daniel E. Chefitz, Gerald P. Konkel, Steven Andrew Luxton, Morgan Lewis and Bockius LLP, Washington, DC, for BSA Limited Partnership, et al.

## MEMORANDUM

J. FREDERICK MOTZ, District Judge.

Plaintiff Nautilus Insurance Company ("Nautilus" or "the Insurer") brings this declaratory judgment action to clarify its duty to defend and indemnify its insured, defendant BSA Limited Partnership ("BSA" or "the Insured"), in a civil suit

brought by defendants Bridgette Feemster, Sabrina Lymore, Mary Brown, Betrice Harris, Michelle Hawkins, Shirley Holland, Dyanne Johnson, Lillian Johnson, Shirley Lattimore, and Dorothy Paul (collectively "Feemster Parties") against BSA.[1] The underlying suit was brought by the Feemster Parties in the United States District Court for the District of Columbia in an action captioned *Bridgette Feemster, et al. v. BSA Limited Partnership,* Case No. 1–04 cv–01901–RBW ("underlying DC suit"). Now pending before the court is plaintiff Nautilus's motion for summary judgment and motion for default judgment against BSA. The issues have been fully briefed and no hearing is necessary. Local Rule 105.6. For the reasons stated below, plaintiff's summary judgment motion is denied in part and granted in part, and plaintiff's motion for default judgment against BSA is granted.[2]

### I.

The underlying DC suit arises out of BSA's ownership and operation of the Bates Street Townhomes ("the Townhomes") in the District of Columbia. The Feemster Parties, plaintiffs in the underlying DC suit, were residents of the Townhomes. BSA participated in the Section 8 rental assistance program, entering into a renewable Housing Assistance Payments ("HAP") contract for the Townhomes with the United States Department of Housing and Urban Development ("HUD"). Under HAP contracts, HUD agrees to provide rental assistance payments to the landlord on the tenant's behalf. The low-income tenant pays 30% of his or her adjusted income, and HUD pays the difference between the tenant's payment and the rent.

When a HAP contract expires, a private landlord may choose to opt-out of Section 8 instead of renewing, but the landlord must give proper notice to tenants affected by the opt-out and tenants have the right under federal law to remain in their units. *See* 42 U.S.C. § 1437f(c)(8)(A); *id.* § 1437f(t)(1)(B). "Enhanced vouchers" are available to enable tenants to remain

---

1. The Fourth Circuit has stated that "[a] dispute between a liability insurer, its insured, and a third party with a tort claim against the insured over the extent of the insurer's responsibility for that claim is an 'actual controversy' within the meaning of the federal Declaratory Judgment Act, even though the tort claimant has not yet reduced his claim against the insured to judgment." *Nautilus Ins. Co. v. Winchester Homes, Inc.,* 15 F.3d 371, 375 n. 3 (4th Cir.1994), *overruled on other grounds by Wilton v. Seven Falls Co.,* 515 U.S. 277, 115 S.Ct. 2137, 132 L.Ed.2d 214 (1995).

2. While defendant BSA accepted service of Nautilus's Complaint through its attorney, Robert Greenberg, BSA has failed to respond to Nautilus's Complaint and has not filed an opposition to Nautilus's motion for summary judgment or motion for default judgment against BSA. Therefore, plaintiff's motion for default judgment is granted. However, the Feemster Parties are "not bound by the default judgment because, as an injured third party, [they are] entitled to defend on the merits in the declaratory judgment proceeding." *Penn America Ins. Co. v. Valade,* 28 Fed.Appx. 253, 256 n. * (4th Cir.2002) (unpublished per curiam op.). As the Fourth Circuit has found, when an insurer brings a declaratory judgment action against the insured and the injured third party, injured third parties such as the Feemster Parties "acquire[ ] standing-independent of that of the insured-to defend itself in the declaratory judgment proceeding." *Id.* at 257. The default judgment entered today against BSA "does not negate the case or controversy existing between the insurer . . . and the injured third party." *Id.; see also Fed. Kemper Ins. Co. v. Rauscher,* 807 F.2d 345, 353 (3d Cir. 1986) (entry of default against insured in insurer's declaratory judgment action did not require entry of judgment against injured parties because the injured parties "ha[d] standing to defend the declaratory judgment action despite the absence of . . . the actual insured").

in units no longer governed by the HAP contract. The vouchers may be used to rent the same unit, if the unit remains a rental property, or a unit at another location. The vouchers are termed "enhanced" because they cover any difference between the previous rent amount under the HAP contract and the new, likely higher, market rent. After opting-out of the Section 8 program, landlords have an obligation to complete the paperwork needed for the tenants' participation in the enhanced voucher program, including execution of a lease that includes a HUD-prescribed tenancy addendum.

BSA decided to opt-out of the program when its HAP contract expired. BSA purported to give the one-year required notice to its tenants, effective September 30, 2004. The DC Housing Authority, which administers the tenant-based voucher program, issued enhanced vouchers to several of the Feemster Parties. However, BSA allegedly refused to accept the enhanced vouchers as rent payment and refused to sign or execute any lease agreements or lease addenda. Instead, BSA required the tenants to pay the full market rent.

The underlying DC suit was filed by the Feemster Parties in November 2004, and a temporary restraining order was issued. A second amended complaint was filed on March 17, 2005, alleging that BSA unlawfully refused to accept enhanced vouchers as rent payments or execute the necessary lease addenda. The Feemster Parties asserted violations of the United States Housing Act and the Multifamily Assisted Housing Reform and Affordability Act of 1997 (as amended), 42 U.S.C. § 1437f, the National Housing Act, 12 U.S.C. § 1701 *et seq.*, the District of Columbia Human Rights Act, D.C.Code § 2–1402.21, and the District of Columbia Consumer Protection Procedures Act, D.C.Code § 28–3901 *et seq.* The Feemster Parties requested injunctive and declaratory relief. Specifically, the Feemster Parties requested a declaration that BSA's acts violated federal and DC law and that BSA must accept the enhanced vouchers. They requested an injunction requiring BSA to accept the enhanced vouchers and complete any requirements necessary to enter into voucher contracts, and forbidding BSA from evicting the Feemster Parties from their units on impermissible grounds. They also requested compensatory and punitive damages, attorneys' fees, and costs.

On January 12, 2007, the District Court for the District of Columbia granted in part and denied in part the parties' cross-motions for summary judgment. *Feemster v. BSA Ltd. P'ship ("Feemster I")*, 471 F.Supp.2d 87 (D.D.C.2007). BSA's motion to alter or amend that order was denied on October 1, 2007, and both parties appealed to the United States Court of Appeals for the District of Columbia. The D.C. Circuit affirmed in part and reversed in part and remanded the case to the district court. *Feemster v. BSA Ltd. P'ship ("Feemster II")*, 548 F.3d 1063, 1071 (D.C.Cir.2008).

Plaintiff Nautilus issued a "Commercial Lines Policy" ("the policy") to defendant BSA, effective September 30, 2004 to September 30, 2005. (Pl.'s Mem. in Supp. of its Mot. for Summ. J. ("Pl.'s Mem.") Ex. A.) Nautilus provided a defense for BSA throughout the underlying litigation.[3]

---

**3.** The Feemster Parties argue that Nautilus's defense of BSA thus far in the underlying DC action shows that Nautilus recognizes the underlying DC suit is potentially covered by the policy. (Defs.' Mem. in Supp. of its Opp. to Pl.'s Mot. for Summ. J. ["Defs.' Mem."] 14.)

Nautilus alleges that it provided a defense to BSA subject to a full reservation of rights. The Feemster Parties respond that they do not have any evidence of this, such as a reservation of rights letter showing that Nautilus is actually defending under a reservation of

Nautilus now seeks a determination of its duty to defend and indemnify BSA in the underlying DC action.

## II.

A motion for summary judgment will be granted when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The substantive law of the cause of action determines which facts are material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The parties agree that Maryland law applies.

Under Maryland law, "[t]he obligation of an insurer to defend its insured under a contract provision . . . is determined by the allegations in the tort actions. If the plaintiffs in the tort suits allege a claim covered by the policy, the insurer has a duty to defend." *Brohawn v. Transamerica Ins. Co.*, 276 Md. 396, 347 A.2d 842, 850 (1975). "Even if a tort plaintiff does not allege facts which clearly bring the claim within or without the policy coverage, the insurer still must defend if there is a *potentiality* that the claim could be covered by the policy." *Id.*; *see also Sheets v. Brethren Mut. Ins. Co.*, 342 Md. 634, 679 A.2d 540, 544 (1996) (duty to defend exists if plaintiffs in a tort action allege an "action that is *potentially covered* by the policy, no matter how attenuated, frivolous, or illogical that allegation may be"). "[A]ny doubt as to whether there is a potentiality of coverage under an insurance policy is to be resolved in favor

of the insured." *Chantel Assocs. v. Mount Vernon Fire Ins. Co.*, 338 Md. 131, 656 A.2d 779, 786 (1995); *see also Aetna Cas. & Sur. Co. v. Cochran*, 337 Md. 98, 651 A.2d 859, 863–64 (1995) ("Our cases indicate that where a potentiality of coverage is uncertain from the allegations of a complaint, any doubt must be resolved in favor of the insured.").

Maryland courts have established a two-part inquiry for determining whether an insurer has a duty to defend its insured. First, the court must determine "the coverage and . . . the defenses under the terms and requirements of the insurance policy." *St. Paul Fire & Marine Ins. Co. v. Pryseski*, 292 Md. 187, 438 A.2d 282, 285 (1981). This inquiry "focuses upon the language and requirements of the policy." *Id.* Second, focusing upon the allegations of the underlying suit, the court must determine whether the "allegations in the tort action potentially bring the tort claim within the policy's coverage." *Id.*

When determining the scope and limitations of coverage under an insurance policy, Maryland courts "construe the instrument as a whole to determine the intention of the parties" and " 'examine the character of the contract, its purpose, and the facts and circumstances of the parties at the time of execution.' " *Clendenin Bros., Inc. v. United States Fire Ins. Co.*, 390 Md. 449, 889 A.2d 387, 393 (2006) (*quoting Pacific Indem. Co. v. Interstate Fire & Cas. Co.*, 302 Md. 383, 488 A.2d 486, 488 (1985)). "When interpreting the language of a contract, 'we accord a word its usual, ordinary and accepted meaning unless there is evidence that the parties

rights. (Defs.' Statement of Genuine Issues of Material Facts in Response to Pl.'s Mot. for Summ. J. 10.) Nautilus has indeed failed to document its reservation of rights on the record before me. However, I need not and do

not consider Nautilus's decision to defend BSA due to my finding that Nautilus has a duty to defend BSA on the federal claims in the underlying DC suit.

intended to employ it in a special or technical sense.'" *Id.* (*quoting Cheney v. Bell Nat'l Life Ins. Co.,* 315 Md. 761, 556 A.2d 1135, 1138 (1989)). If the terms used are unambiguous, the meaning of the terms are determined by the court as a matter of law. *Id.* If the terms of the policy are ambiguous, the court may consult extrinsic evidence. *Id.* A contract term is ambiguous " 'if, to a reasonably prudent person, the term is susceptible to more than one meaning.'" *Id.* (*quoting Cole v. State Farm Mut. Ins. Co.,* 359 Md. 298, 753 A.2d 533, 537 (2000)). While Maryland does not apply the principle found in other jurisdictions that an insurance policy is to be construed most strongly against an insurer, an ambiguous term will ordinarily be resolved against the party who drafted the contract. *Id.* at 394.

 As an initial matter, the Feemster Parties argue that a declaratory judgment is inappropriate because the underlying suit "remains pending with several factual issues to be decided[,] many of them implicating the very coverage issues at issue in this suit." (Pl.'s Mem. 13.) Similarly, the Feemster Parties also argue that summary judgment is inappropriate "with material facts in dispute, going to the underlying liability of BSA." (Pl.'s Mem. 18.) Declaratory judgments to resolve issues in pending tort cases should be rare, but can be appropriate on certain occasions to resolve questions of insurance policy coverage that are "independent and separable from the claims asserted in a pending suit by an injured third party." *Brohawn,* 347 A.2d at 848. Here, I am deciding only whether the allegations in the underlying DC suit create a duty for Nautilus to defend BSA; the truth of these allegations will be determined in the DC proceedings. *See Nationwide Mut. Ins. Co. v. Jones,* No. JFM–05–2792, 2006 WL 361336, at *2 (D.Md. Feb. 15, 2006)

(unpublished). In determining a duty to defend, a court simply compares the insurance policy with the complaint in the underlying action. Any disputes over actual liability will be decided in the underlying case, not in this court.

The Feemster Parties present two possible sources of Nautilus's duty to defend BSA in the underlying DC suit: Coverage A, Bodily Injury and Property Damage Liability, and Coverage B, Personal and Advertising Injury Liability.

### III.

Coverage A of the policy provides Bodily Injury and Property Damage Liability. It provides in relevant part:

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any 'suit' seeking those damages....

b. This insurance applies to "bodily injury" and "property damage" only if:

(1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

. . .

(Pl.'s Ex. A, CG 00 01 10 01, at 1.) "Bodily injury" is defined as "bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time." (*Id.* at 13.) "Property damage" is defined as either "[p]hysical injury to tangible property, including all resulting loss of use of that property," or "[l]oss of use of tangible property that is not physically injured." (*Id.* at 15.) "Occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

(*Id.* at 14.) The term "accident" is not defined in the policy. I must determine whether BSA's refusal to accept enhanced vouchers or take the steps necessary to enable tenants to use vouchers constituted "an accident" under the policy so as to implicate coverage under Coverage A.

Nautilus asserts that it is undisputed that BSA *intentionally* refused to execute new leases and lease addenda for the Feemster Parties that allowed the use of enhanced vouchers, which effectively operated as a refusal to accept the enhanced vouchers. Nautilus claims that BSA "intended and expected that the Feemster parties would be unable to remain in the Townhomes," conduct also amounting to a breach of contract, which is not an accident. (Pl.'s Mem. 11.) The Feemster Parties respond that BSA's intentional refusal to accept the enhanced vouchers was an "accident" because "BSA claims its intentions were not to violate the law or the *Feemster* Parties' rights, despite the consequences of those actions." (Pl.'s Mem. 16–17.)

An injury caused by an intentional act may be caused by an "accident" " 'if in that act, something unforeseen, unusual and unexpected occurs which produces the event.' " *Cole,* 753 A.2d at 540 (*quoting Harleysville Mut. Cas. Co. v. Harris & Brooks, Inc.,* 248 Md. 148, 235 A.2d 556, 558 (1967)); *see also id.* (noting that "injuries caused by intentional acts may be 'caused by accident' if something in the intentional act produces an unusual or unexpected result"). The "question that a court must answer is whether the damage caused by the actor's intentional conduct was unforeseen, unusual and unexpected." *Id.* (internal quotation marks omitted). Here, the damage allegedly caused by BSA includes discrimination, interference with the tenants' rights to use vouchers, denial of monthly utility allowances to the tenants, and a threat to the tenants of eviction or displacement from their homes. These damages were foreseeable and expected, and thus these intentional acts could not potentially be covered by Coverage A. *Cf. Knapp v. Smiljanic,* 847 F.Supp. 1428, 1437 (W.D.Wis.1994), *aff'd on other grounds by* 54 F.3d 1272 (7th Cir.1995) (where insured turned down a prospective tenant's application because of her status as a Section 8 voucher recipient, a "volitional, purposeful act," the resulting injuries were not unexpected because the insured "intended to prevent plaintiff from obtaining the apartment she wanted and would have expected that thwarting plaintiff in this way would cause her some harm").

A similar analysis shows that coverage is also precluded by the "Expected or Intended Injury" exclusion in Coverage A. *See ABT Building Prods. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh,* 472 F.3d 99, 121 (4th Cir.2006) (noting a North Carolina court's observation that "courts must look to 'whether the damage was expected or intended' in determining whether an event constitutes an 'occurrence' ") (*citing Waste Mgmt. of Carolinas, Inc. v. Peerless Ins. Co.,* 315 N.C. 688, 340 S.E.2d 374, 380 (1986) (finding that "[w]hether events are 'accidental' and constitute an 'occurrence' depends upon whether they were expected or intended from the point of view of the insured")). The policy states that Coverage A insurance does not apply to " 'Bodily Injury' or 'property damage' expected or intended from the standpoint of the insured." (Pl.'s Ex. A, CG 00 01 10 01, at 2.) According to the underlying complaint, BSA refused to accept enhanced vouchers in order to render its tenants unable to pay their rent and remain in their homes. These injuries were allegedly expected and intended, and

Nautilus has no duty to defend under Coverage A.[4]

### IV.

Coverage B, Personal and Advertising Injury Liability, provides: "We will pay those sums that the insured becomes legally obligated to pay as damages because of 'personal and advertising injury' to which this insurance applies. We will have the right and duty to defend the insured against any 'suit' seeking those damages." (Pl.'s Ex. A, CG 00 01 10 01, at 5.) The policy defines "personal and advertising injury" as:

> injury, including consequential "bodily injury", arising out of one or more of the following offenses:
>
> a. False arrest, detention or imprisonment;
>
> b. Malicious prosecution;
>
> c. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;
>
> d. Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;
>
> e. Oral or written publication, in any manner, of material that violates a person's right of privacy;
>
> f. The use of another's advertising idea in your "advertisement"; or

> g. Infringing upon another's copyright, trade dress or slogan in your advertisement".

(*Id.* at 14.) Coverage for personal injury need not arise from an "occurrence," as is required under Coverage A.

The Feemster Parties argue that subsection (c) creates a duty to defend. The complaint in the underlying DC suit alleges no wrongful eviction or wrongful entry.[5] Therefore, the potentially applicable offense is "invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor."

The Feemster Parties assert that any interference with their right to use enhanced vouchers invades their right of private occupancy of their homes. (Defs.' Mem. 18.) Nautilus responds that neither Maryland courts nor the District of Columbia courts have found that the "right of private occupancy" includes any right not tied to the possession or use of the property, and as the Feemster Parties were not prevented from full use and enjoyment of their property, this clause does not create coverage. (Reply to Feemster Parties' Opp. to Pl.'s Mot. for Summ. J. 9.)

The question, then, is whether the acts alleged in the underlying DC complaint amount to an "invasion of the right of private occupancy." The phrase is "widely used" in insurance policies and "has been the subject of heated litigation throughout the entire country over the past thirty years," generating "hundreds of law suits and widely varying judicial interpretations." *New Castle County v. Nat'l Union*

---

**4.** Given this ruling, I need not address Plaintiff's argument that BSA had knowledge of the claim before the policy period. (*See* Pl.'s Mem. 13.)

**5.** The Feemster Parties argue that a claim involving *threats* of wrongful eviction invokes

coverage under the "wrongful eviction" provision. (Defs.' Mem. 18.) But threats of wrongful eviction are not an injury arising from wrongful eviction. The Feemster Parties did not allege that any tenant had actually been wrongfully evicted.

*Fire Ins. Co. of Pittsburgh*, 243 F.3d 744, 747 (3d Cir.2001); *see also id.* at 755 ("After at least two decades of litigation over the meaning of the term 'invasion of the right of private occupancy,' courts have not arrived at a uniform definition of the term."). One commentator notes that the term "right of private occupancy" "has been interpreted to require a range of activity, from as much as a physical trespass upon a real property interest to lesser intrusions and impairments of the use and enjoyment of property, such as the invasion of privacy or a mere legal encroachment upon an economic interest." *Am. Guarantee & Liab. Ins. Co. v. 1906 Co.*, 273 F.3d 605, 620 n. 8 (5th Cir.2001) (*citing* M. Jane Goode, *Personal Injury Liability Coverage*, 30–SPG Brief 39 (Spring 2001), at 41–43 & nn. 21–35). Maryland courts have not yet interpreted the term "right of private occupancy." Therefore, I must interpret this term as it appears that the Court of Appeals of Maryland would. *See Private Mortgage Inv. Servs., Inc. v. Hotel and Club Assocs., Inc.*, 296 F.3d 308, 312 (4th Cir.2002) (stating that "in a situation where the South Carolina Supreme Court has spoken neither directly nor indirectly on the particular issue before us, we are called upon to predict how that court would rule if presented with the issue"); *Roe v. Doe*, 28 F.3d 404, 407 (4th Cir.1994) ("Where there is no case law from the forum state which is directly on point, the district court attempts to do as the state court would do if confronted with the same fact pattern.").

Several courts that have interpreted this phrase in insurance policies emphasize that the term "invasion of the right of private occupancy" follows the enumeration of two specific actions related to possessory interests in real property: wrongful eviction and wrongful entry. Courts often employ the rule of *ejusdem generis*, a principle of contract interpretation suggesting that when a general word follows a series of specific words, the specific words restrict the general. Here, the rule would operate to limit the phrase's meaning to "actions of the same general type as, though not specifically embraced within, 'wrongful entry or eviction.'" *Liberty Mut. Ins. Co. v. E. Cent. Okl. Elec. Coop.*, 97 F.3d 383, 390 (10th Cir.1996) (applying Oklahoma law). The phrase has been limited under the principle of *ejusdem generis* to "an invasion of a real property right" "of the same general type as 'wrongful entry or eviction'." *Id.* at 390–91; *see also Red Ball Leasing, Inc. v. Hartford Accident & Indem. Co.*, 915 F.2d 306, 312 (7th Cir.1990) (under Indiana law, the rule of *ejusdem generis* "precludes coverage for anything other than invasions of real property"); *Martin v. Brunzelle*, 699 F.Supp. 167, 170 (N.D.Ill.1988) (same; applying Illinois law); *County of Columbia v. Cont'l Ins. Co.*, 189 A.D.2d 391, 595 N.Y.S.2d 988, 991 (1993) (under New York law, coverage under this phrase was "limited to liability for purposeful acts aimed at dispossession of real property by someone asserting an interest therein").

Other courts have construed the term more broadly. In *New Castle County*, a landowner brought suit against a town, the insured, because the town frustrated the landowner's development plans by denying a building permit, voiding a record plan for a property, and rezoning the property. 243 F.3d at 747. Relying on "commonsense," the Third Circuit found that, under Delaware law, the term "invasion of the right of private occupancy" included those claims. *Id.* The dissent argued that claims for "financial harms like the denial of a voiding permit, the voiding of a development plan, and the rezoning of land" were beyond the intended scope of the policy. *Id.* at 757. Similarly, the New Hampshire Supreme Court found a duty to defend

under the "right of private occupancy" clause where a city's zoning decisions destroyed the opportunity for development of a landowner's property, finding that the city's zoning decisions limited the underlying plaintiff's "right to the free enjoyment of his property without due process of law." *Town of Goshen v. Grange Mut. Ins. Co.*, 120 N.H. 915, 424 A.2d 822, 824 (1980). The court concluded that "an appreciable and tangible interference with the physical property itself" was not required for an act to constitute an invasion of the right of private occupancy. *Id.*

In a case cited by Nautilus, the District Court for the District of Columbia found that violations of the warranty of habitability constituted an "invasion of the right of private occupancy." *Beltway Mgmt. Co. v. Lexington–Landmark Ins. Co.*, 746 F.Supp. 1145, 1151 (D.D.C.1990). The court stated that the " 'right of private occupancy' refers to those rights associated with an individual's act of occupying an apartment," and found that this clause covered a "broad range" of claims "arising from a landlord's deprivation of a tenant's rights." *Id.* at 1151–53. The court reasoned that "under current property law, and even more importantly under contemporary understanding of the landlord-tenant relationship, it is natural to interpret the broad rights of private occupancy to include the warranty of habitability and the right to a premises 'suitable for occupation.' " *Id.* at 1153.

■ I find that the phrase "invasion of the right of private occupancy" is ambiguous because it is reasonably susceptible to more than one meaning. *See Clendenin Bros.*, 889 A.2d at 393. The wide range of interpretations given to the phrase by various courts lends support to this finding. *See New Castle County*, 243 F.3d at 756 ("A single phrase, which insurance companies have consistently refused to define,

and that has generated literally hundreds of lawsuits, with widely varying results, cannot, under our application of commonsense, be termed unambiguous."). When a phrase is ambiguous, the court may consult extrinsic evidence, and if extrinsic evidence does not clear up the ambiguity, the contract is construed against the insurer. *United Capitol Ins. Co. v. Kapiloff*, 155 F.3d 488, 495 (4th Cir.1998).

■ Because the parties present no extrinsic evidence as to the intention of the parties at the time of contract, this ambiguity is construed against the insurer. *See Cheney*, 556 A.2d at 1138 ("If no extrinsic or parol evidence is introduced, or if the ambiguity remains after consideration of extrinsic or parol evidence that is introduced, it will be construed against the insurer as the drafter of the instrument."). " '[A]ny doubt as to whether there is a potentiality of coverage under an insurance policy is to be resolved in favor of the insured.' " *Clendenin Bros.*, 889 A.2d at 394 (*quoting Chantel Assocs.*, 656 A.2d at 786); *see also Litz v. State Farm Fire & Cas. Co.*, 346 Md. 217, 695 A.2d 566, 572 (1997) ("If there is a possibility, even a remote one, that the plaintiffs' claims could be covered by the policy, there is a duty to defend."). Guided by a recognition that the ambiguity of the phrase and any doubt regarding potentiality of coverage are to be resolved in favor of the insured, BSA, I conclude that Nautilus has a duty to defend the federal claims under the "invasion of the right of private occupancy" clause, but it has no duty to defend the DC law claims.

A.

■ The two federal claims in the underlying complaint in essence allege that the tenants had a right to remain in their homes after BSA's opt-out and to use enhanced vouchers as rent payments. (*See*

Compl. ¶¶ 85, 87.) BSA allegedly violated this right by refusing to execute a lease that included the HUD tenancy addendum and refusing to accept the enhanced vouchers as rent payment. These claims can be considered an "invasion of the right of private occupancy" because they "aris[e] from a landlord's deprivation of a tenant's rights." *Beltway*, 746 F.Supp. at 1153. They involve a financial harm interfering with the tenants' right to remain on their property.

Even under a stricter interpretation of the phrase, requiring "invasions of the qualitative aspects of established possessory interests," *Bernstein v. N.E. Ins. Co.*, 19 F.3d 1456, 1458 (D.C.Cir.1994), it is arguable that the clause covers the actions alleged in the federal claims. While the alleged federal statutory violations involve not an actual entrance by BSA onto the physical property of the Feemster Parties, but BSA's refusal to accept enhanced vouchers and execute lease addenda, these actions are part and parcel of the Feemster Parties' ability to retain their established possessory interest in their homes. The Feemster Parties possessed an existing right to private occupancy of their homes, and BSA refused to execute the lease addenda necessary for the Feemster Parties to remain.[6] This refusal was allegedly motivated by a desire to dispossess the Feemster Parties of their homes, an invasion of their right to remain on their property after BSA opted-out of the Section 8 program. *Cf. Jeanty v. Shore Terrace Realty Assoc.*, No. 03 Civ. 8669(BSJ), 2004 WL 1794496, at *4 (S.D.N.Y. Aug. 10, 2004) (unpublished) (agreeing with HUD's interpretation that 42 U.S.C. § 1437f "mean[s] that families who receive enhanced vouchers have the right to remain, and that a landlord *must* accept their enhanced vouchers unless the landlord evicts them through the court system").

■ Nautilus argues that even if the federal claims allege injuries within the scope of Coverage B, two exclusions apply so as to preclude coverage. First, Nautilus argues that the breach of contract policy exclusion contained in Coverage B applies because BSA's alleged duty to accept enhanced vouchers and execute new leases arose from BSA's contract with HUD and any failure to do so breaches that contract. (*See* Pl.'s Mem. 19–20; Pl.'s Ex. A, CG 00 01 10 01, at 6 [" 'Personal and advertising injury' arising out of a breach of contract, except an implied contract to use another's advertising idea in your 'advertisement'."].) However, the federal causes of action arise from violation of rights created by federal statute, not by contracts. While BSA's liability potentially rests in part on its refusal to enter into a contract—the lease addenda—this does not itself bring the plaintiff's allegations within the scope of the exclusion. The breach of contract exclusion does not operate to preclude coverage.

■ Second, Nautilus asserts that coverage is precluded by the "Knowing Violation of Rights of Another" exclusion, which states that the insurance does not apply to " '[p]ersonal and advertising injury' caused

---

**6.** On the other hand, both wrongful entry and wrongful eviction involve some physical intrusion upon an interest in real property. Refusing to accept a form of payment or execute a lease may interfere with a tenant's ability to pay, but do not physically interfere with a tenant's property. If the Feemster Parties paid in full without using enhanced vouchers, their occupancy continued uninterrupted. While BSA may have interfered with the tenant's interest in personal property—the enhanced vouchers—this does not necessarily create an interference with the tenant's interest in real property. However, given that all ambiguities are to be construed in favor of the insured, I find that the federal law claims are covered under Coverage B.

by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict 'personal and advertising injury.'" (Pl.'s Ex. A, CG 00 01 10 01, at 6.) This exclusion has been referred to as the "intent exclusion." *Zurich Am. Ins. Co. v. Fieldstone Mortgage Co.*, No. CCB–06–2055, 2007 WL 3268460, at *6 n. 5 (D.Md. Oct. 26, 2007) (unpublished). This exclusion is also inapplicable. While the allegations in the underlying complaint assert that BSA intended to commit the *acts* that violated the Feemster Parties' statutory right, the underlying complaint does not assert that BSA intended to violate the statutory right itself. In other words, though the Feemster Parties allege that BSA knowingly failed to accept the vouchers and execute the lease addenda, the Feemster Parties did not allege, because they did not need to, that BSA knowingly violated the Feemster Parties' right of occupancy. The violations alleged in the federal causes of action do *not* require a showing of intent.

And BSA in the underlying action strenuously argued that it believed the tenants had no right to remain in their homes because the units were no longer offered as rental units. Indeed, as the D.C. Circuit found, the landlord's intent is irrelevant in determining whether the statute is violated. *See Feemster II*, 548 F.3d at 1069 ("This is an objective inquiry tied to the legal status of the property, not to the owners' intentions."). Given that the Feemster Parties did not (and need not) allege that BSA *knew* it was violating the rights of the tenants to remain in their homes, the policy's intent exclusion does not preclude coverage for the federal claims.[7]

## B.

The District of Columbia Human Rights Act ("DCHRA") claim, however, does not allege injuries arising out of the "invasion of the right of private occupancy."[8] Plaintiffs alleged BSA violated the

---

7. I note that if all intentional acts came within the scope of the intent exclusion, coverage would be precluded for personal and advertising injuries *specifically covered* in Coverage B. For example, false imprisonment, a specifically covered offense, requires a showing of intent. *See* Md. Pattern Jury Instructions–Civil § 15–463 (Intentional Interference with the Person) ("False imprisonment is the intentional restriction without legal justification of the freedom of movement of a person who is aware of the restriction and who does not consent."). If the intent exclusion precluded coverage for false imprisonment claims, litigation coverage for suits bringing those claims would be illusory. *See Secura Ins. Co. v. Gorsick*, No. 3:06CV–596R, 2008 WL 341383, at *5 (W.D.Ky. Feb. 6, 2008) (unpublished mem. op.) (finding that the intent exclusion did not preclude coverage of a malicious prosecution claim because, even though malicious prosecution requires "an evil, or unlawful motive, or purpose," and the intent exclusion prohibits coverage for injuries caused by actions made with such intent, this self-contradictory policy language should be construed "narrowly so as to render the in-

surance effective, resolving any doubt as to the coverage or terms in favor of the insured"). Yet finding the intent exclusion itself superfluous would also fail to give effect to all of the contractual provisions. *See Nat'l Cas. Co. v. Lockheed Martin Corp.*, 415 F.Supp.2d 596, 602 (D.Md.2006) (*citing Baltimore Gas & Elec. Co. v. Commercial Union Ins. Co.*, 113 Md.App. 540, 688 A.2d 496, 503 (Md.Ct.Spec.App.1997)) (under Maryland law, "any construction of a contract that makes another provision superfluous is generally disfavored"). A way to reconcile the intent exclusion with the listed offenses is to give effect to the intent exclusion only when intent is not an element of the listed offense. Offenses involving "invasion of the right of private occupancy" may not necessarily require a showing of intent. The intent exclusion, therefore, would preclude coverage when only an intentional violation of the right is alleged in the complaint.

8. The Feemster Parties also brought a claim under the District of Columbia Consumer Protection Procedures Act ("DCCPPA"),

DCHRA because "[b]y refusing to accept vouchers or take the steps necessary to enable Plaintiffs to use their vouchers at the Bates Street Townhomes, Defendant is discriminating against Plaintiffs." (Compl. ¶ 89.) Plaintiffs further alleged that "Defendant's policy and/or practice of refusing to rent to Plaintiffs and other residents of the Bates Street Townhomes based on voucher status constitutes discrimination based on the actual or perceived source of income of Plaintiffs." (Compl. ¶ 90.) The DCHRA states in relevant part:

It shall be an unlawful discriminatory practice to do any of the following acts, wholly or partially for a discriminatory reason based on the actual or perceived ... source of income ... of any individual:

(1) To interrupt or terminate, or refuse or fail to initiate or conduct any transaction in real property; or to require different terms for such transaction; or to represent falsely that an interest in real property is not available for transaction;

(2) To include in the terms or conditions of a transaction in real property, any clause, condition or restriction; . . . .

D.C.Code § 2–1402.21(a).

Even if the discrimination claims could be considered an invasion of the right of private occupancy, coverage for the DCHRA claim is precluded by the "knowing violation of rights of another" exclusion because discrimination is an intentional tort. The injury would be caused by BSA "with the knowledge that the act would violate the rights of another." Therefore, Nautilus has no duty to defend BSA as to the DCHRA claim.

▪▪▪▪ Even though the DCHRA claim is not covered by the policy and Nautilus has no independent duty to defend BSA against it, Nautilus does have a duty to defend the non-covered claims while the covered federal claims are being litigated. "[I]n most circumstances, 'if any claims potentially come within the policy coverage, the insurer is obligated to defend all claims, notwithstanding alternative allegations outside the policy's coverage.'" *Perdue Farms, Inc. v. Travelers Cas. & Sur. Co. Of America*, 448 F.3d 252, 257 (4th Cir.2006) (*quoting Utica Mut. Ins. Co. v. Miller*, 130 Md.App. 373, 746 A.2d 935, 940 (Md.Ct.Spec.App.2000)); *see also Warfield–Dorsey Co. v. Travelers Cas. & Sur. Co. of Illinois*, 66 F.Supp.2d 681, 688 (D.Md.1999) ("If some of the claims against an insured fall within the terms of coverage, and some without, the insurer must still defend the entire claim.").[9]

---

D.C.Code § 28–3901 *et seq.* This claim was dismissed by the district court and was not appealed by the Feemster Parties. Therefore, the district court's dismissal of the DCCPPA claim has become final. (*See* Pl.'s Mem. 6 n. 1.) Given that Nautilus's defense of BSA on the DCCPPA claim was fully concurrent with the federal law claims, and Nautilus is required to defend the entire action while the federal law claims are being litigated, I need not determine whether the DCCPPA claim alone would independently give rise to coverage under Coverage B.

**9.** I note that the duty to defend ends when the "claim might be confined to non-covered allegations." *Baltimore Gas & Elec. Co. v. Commercial Union Ins. Co. ("BGE")*, 113 Md.App.

540, 688 A.2d 496, 512 (Md.Ct. Spec.App.1997). It seems clear to me the insurer will no longer have a duty to defend when the federal claims have been fully adjudicated. In an analogous situation, Maryland courts have determined that where a court grants a plaintiff's motion to dismiss the covered claims, the suit becomes "confined to non-covered allegations" and the insurer no longer has a duty to defend against the non-covered claims. *BGE*, 688 A.2d at 512–14. In *BGE*, the Maryland Court of Special Appeals looked to the contractual nature of the insurer-insured relationship and noted that "[t]he insurer is not obligated to provide a defense to a suit that does not assert a covered claim. Therefore, as a matter of con-

## V.

 Nautilus also seeks summary judgment regarding indemnification due under the policy. "[T]he duty to defend is broader than the duty to indemnify." *Walk v. Hartford Cas. Ins. Co.*, 382 Md. 1, 852 A.2d 98, 106 (2004). The "duty to defend depends only upon the facts as alleged, and the duty to indemnify depends upon liability." *Id.* "Generally, the question of whether a company must indemnify 'turns on a comparison of the ultimate findings of fact concerning the alleged occurrence with the policy coverage.'" *USAA Cas. Ins. Co. v. Mummert*, 213 F.Supp.2d 538, 541 (D.Md.2002) (*quoting Steyer v. Westvaco Corp.*, 450 F.Supp. 384, 389 (D.Md.1978)). A "company's duty to pay a judgment 'depend[s] on the scope of coverage under the policy.'" *Id.* (*quoting Steyer*, 450 F.Supp. at 389) (alteration in original).

 The litigation in the underlying DC suit is ongoing. On November 14, 2008, the D.C. Circuit remanded the case to the district court for further proceedings. Any damages have not yet been determined or calculated. Of course, Nautilus ultimately will have no duty to indemnify BSA for any damages arising from the non-covered DCHRA claim, but until damages for all of the Feemster Parties' claims have been determined and calculated, a declaratory judgment ruling on the indemnity question would be premature. There-

fore, I decline to determine Nautilus's duty to indemnify BSA in the underlying suit.

For the foregoing reasons, I grant in part and deny in part plaintiff's motion for summary judgment. Plaintiff's motion for default judgment against BSA is granted. A separate order to that effect is being entered herewith.

## ORDER

For the reasons stated in the accompanying Memorandum, it is, this 10th day of March 2009

### ORDERED

1. Plaintiff's motion for default judgment against defendant BSA is granted;

2. Plaintiff's motion for summary judgment is granted in part and denied in part;

3. It is declared that Nautilus Insurance Company has a duty to defend BSA Limited Partnership as to the first and second causes of action in *Feemster v. BSA Limited Partnership*, No. 04–CV1901–RBW, in the United States District Court for the District of Columbia;

4. I decline to enter a declaratory judgment as to Count III for lack of ripeness;

5. This action is administratively closed, subject to being reopened as to Count III upon notice by either party within 30 days of the resolution of the

---

tract interpretation, the insurer is entitled to refuse to defend a suit for which it has no obligation under the contract." *Id.* at 512. These principles apply equally to a situation where the covered claims have been fully litigated and only the non-covered claims are still at issue. To find otherwise would be to require Nautilus to defend claims not covered by the policy. *See Meadowbrook, Inc. v. Tower Ins. Co.*, 559 N.W.2d 411, 416 (Minn.1997) ("To require an insurer who undertakes a defense on the basis of arguably covered claims to remain in the litigation even after

those claims have been resolved, is to force the insurer to defend claims not arguably covered by the policy.") (holding that "an insurer who undertakes an insured's defense under a reservation of rights can withdraw its defense once all arguably covered claims have been dismissed with finality"). At this point, the federal claims are still active, given the litigation in the underlying DC suit over the release of excess rents held in escrow. However, if the federal claims are fully resolved, there is no continuing duty on the part of Nautilus to defend BSA on the DCHRA claim.

federal claims pending in the United States District Court of the District Columbia.